UNITED STATES of America, Plaintiff-Appellee,

v.

Kishor VAGHELA, Defendant-Appellant.

No. 97-3472.

United States Court of Appeals,

Eleventh Circuit.

March 12, 1999.

Appeal from the United States District Court for the Middle District of Florida. (No. 97-68-CR-T-17C), H. Dale Cook, Judge.

Before DUBINA and BARKETT, Circuit Judges, and JONES[*], Senior Circuit Judge.

BARKETT, Circuit Judge:

Kishor Vaghela appeals from his conviction for conspiracy to defraud the United States and to obstruct justice, and from his conviction for soliciting and receiving kickbacks for Medicare referrals. Vaghela raises three arguments in this appeal: (1) that there was insufficient evidence to support his conviction for conspiracy to obstruct justice; (2) that the district court erred in assessing the restitution owed at the total amount for which the United States Department of Health and Human Services ("DHHS") was billed for work referred by Vaghela, rather than at the amount Vaghela actually received in illegal kickbacks; and (3) that his convictions were tainted by improper remarks made during the prosecution's closing argument. We reject the final of these arguments without comment, *see* 11th Cir. R. 36-1, but find the first and second to be meritorious. We therefore REVERSE Vaghela's conviction for conspiracy to obstruct justice, AFFIRM his conviction on all other counts, VACATE the order for restitution in the amount of $50,420.02, and REMAND to the district court for further proceedings consistent with this opinion.

I.      Background

Kishor Vaghela was the office manager for the Family Medical Center ("FMC"), a medical practice owned and operated by Drs. Larry Levine and Gary Levine. In August of 1993, Raghu Desai, president and

---

[*]Honorable Nathaniel R. Jones, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

owner of Extendicare Clinical Laboratory ("Extendicare"), contacted Vaghela. Desai had heard that FMC was in the market for a lab to handle its labwork, and was hoping to secure this business for Extendicare. Vaghela told Desai that he would refer $8000 to $10,000 in business each month to Extendicare in exchange for personal monthly payments to Vaghela of $2000 to $2500. Desai accepted this offer. Between August 1993 and August 1994, Vaghela referred the labwork of 452 Medicare patients to Extendicare. In exchange for these referrals, Extendicare paid Vaghela personally a total of $23,400 in kickbacks. The labwork performed by Extendicare was ultimately paid for by DHHS in the total amount of $50,420.02.

In August 1994, Desai told Vaghela that Extendicare's payments to Vaghela were being investigated, and that they needed to draft a contract that would legitimize them. The pair then drafted and signed a contract, backdated to August 1993, stating that all of Extendicare's payments to Vaghela had been made in exchange for Vaghela's "consulting services."

Some time later,[1] Desai was interviewed by federal agents. Subsequently, in December 1995, Desai called Vaghela to discuss strategy. Vaghela told him to "stick with the contract." On January 31, 1996, a federal grand jury subpoenaed records from Desai. Desai produced the back-dated contract and copies of the checks he had given Vaghela. Before producing the checks, Desai altered them, adding a memo showing that they were paid in exchange for "consulting work." Desai also produced 1099 forms stating that Desai had employed Vaghela as a consultant in 1993 and 1994.

During the investigation, the FBI arranged for Drs. Levine and Levine to engage Vaghela in conversation about the referral payments made to Vaghela by Extendicare. This conversation was recorded by the FBI. During this conversation, the physicians discussed Vaghela's apparent failure to share with them the money he received from Extendicare, commented on how the payments were likely to appear to Medicare, and referred to the money received by Vaghela from Extendicare as "rent." Vaghela made no response to these allegations.

---

[1]The record does not provide a specific date for this interview.

Vaghela was indicted by a grand jury in February 1997, and was tried in July of that year. During closing arguments, the prosecutor drew the jury's attention to Vaghela's non-responsiveness when confronted on tape by his employers, and suggested that the jury could draw conclusions regarding Vaghela's guilt from his silence during that conversation.

The jury found Vaghela guilty on all counts, including one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, thirteen counts of soliciting and receiving kickbacks in violation of 18 U.S.C. § 1320a-7b(b)(1)(A), and one count of conspiracy to obstruct justice in violation of 18 U.S.C. § 371. The district court sentenced him to 21 months of imprisonment and three years of supervised release on each count, with the sentences to run concurrently. The district court also ordered Vaghela to pay restitution to Medicare in the amount of $50,420.02. Vaghela now appeals.

II.     Discussion

1.     *The Conspiracy to Obstruct Justice*

In this appeal, Vaghela argues that there was insufficient evidence to convict him of conspiracy to obstruct justice. Specifically, Vaghela argues that because there was no judicial proceeding ongoing at the time of the acts supporting the conspiracy charge, the government failed to prove its case on this count. *See United States v. Cihak,* 137 F.3d 252, 263 (5th Cir.1998) (holding that in order for the government to prove conspiracy to obstruct justice, "there must have existed a pending judicial proceeding at the time that defendants acted."). In response, the government maintains that it is enough for the government "to prove that the conspirators undertook to obstruct the due administration of justice in a federal proceeding that they anticipated would commence in the future." *United States v. Messerlian,* 832 F.2d 778, 794 (3d Cir.1987). The government argues that because the defendants were being investigated, it was foreseeable that a federal proceeding would commence in the future and that the course of action agreed to by Vaghela and Desai would obstruct it.

The elements of the offense of conspiracy are "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *United States v. Toler,* 144 F.3d 1423, 1426 (11th Cir.1998); *see also* 2 WAYNE R. LA FAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 6.4 at 60 (1986). To be guilty of conspiracy, in other words, parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law. To prove conspiracy to obstruct justice, the government must therefore show that the defendant, in concert with one or more others, agreed to commit acts that would violate § 1503.

There is no question that Vaghela and Desai made an agreement. The question we must resolve is whether the acts they agreed to commit would violate § 1503. For if they would not, Vaghela could not be found guilty of conspiracy to obstruct justice, for the simple reason that such a finding *would find him guilty of conspiring to commit acts that are not themselves illegal.* Accordingly, we turn to the question of whether Vaghela's act would be violative of § 1503, the substantive offense Vaghela was accused of conspiring to commit.

At the time of the events leading to Vaghela's arrest and conviction, 18 U.S.C. § 1503 provided in relevant part that

> Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.[2]

8 U.S.C. § 1503 (cited in *United States v. Aguilar,* 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995)). This provision of § 1503 is known as the "Omnibus Clause," and "serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice." *United States v. Aguilar,* 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). Not surprisingly, the broad language

---

[2]This statute has since been amended. The above quoted language is now contained in 18 U.S.C. § 1503(a) (1998).

4

of § 1503's Omnibus Clause generated disagreement among the circuits as to the sorts of actions that would trigger this provision and ground a conviction for the substantive offense of obstruction of justice.[3]

In *Aguilar,* the Supreme Court resolved this disagreement. Citing with approval the effort of courts of appeals "to place metes and bounds on the very broad language of the catchall provision," the Court read into § 1503's Omnibus Clause what it termed a " 'nexus' requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings." *Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357 (citing *United States v. Wood,* 6 F.3d 692, 696 (10th Cir.1993); *United States v. Walasek,* 527 F.2d 676, 679 & n. 12 (3d Cir.1975)); *see also id.* at 600, 115 S.Ct. 2357 ("[W]e think the 'nexus' requirement developed in the decisions of the Courts of Appeals is a correct construction of § 1503."). Specifically, drawing on its holding in *Pettibone v. United States,* 148 U.S. 197, 206, 13 S.Ct. 542, 37 L.Ed. 419 (1893), that "a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice that justice was being administered in such court," the Court found that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct [justice under § 1503]." *Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357.

In *Aguilar*, a United States District Judge was charged and convicted of one count of § 1503 for lying to F.B.I. agents who were investigating an alleged conspiracy to influence the outcome of a habeas case

---

[3]Our own circuit took a broad view of § 1503's Omnibus Clause, requiring simply that the government establish "that the defendant should have reasonably foreseen that the natural and probable consequence of the success of his scheme would [obstruct the due administration of justice]." *United States v. Silverman,* 745 F.2d 1386, 1393 (11th Cir.1984). The Fifth Circuit adopted a far narrower interpretation, holding that to prove a violation of this clause, the government must establish three core elements: "(1) there must be a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly with the specific intent to obstruct or impede the proceeding in its due administration of justice." *United States v. Williams,* 874 F.2d 968, 977 (5th Cir.1989). Other circuits, including the Third and the Tenth, took a position falling somewhere between our own and that of the Fifth Circuit. *See United States v. Walasek,* 527 F.2d 676, 679 n. 12 (3d Cir.1975) (finding in § 1503's Omnibus Clause the need to "assess the extent of the relationship, whether in time, causation or logic, between the acts complained of and the progress of some 'administration of justice' "); *United States v. Wood,* 6 F.3d 692, 696 (10th Cir.1993) ("[P]articular acts, 'although arguably interfering with some aspect of the administration of justice, may be beyond the scope of § 1503 because the nexus to the progress of a judicial proceeding is too attenuated and the statutory construction therefore too strained.' ") (quoting *Walasek,* 527 F.2d at 679).

5

pending in the district where he served. The Supreme Court, however, found there to be insufficient evidence to support a conviction under § 1503. *See Aguilar,* 515 U.S. at 606, 115 S.Ct. 2357. Although a grand jury had already begun investigation into the conspiracy, the Court found the evidence offered by the government to be insufficient to support a conclusion "that [Aguilar] knew that his false statement would be provided to the grand jury." *Id.* at 601, 115 S.Ct. 2357. Instead, the Court found the evidence to "go[ ] no further than showing that [Aguilar] testified falsely to an investigating agent," and that "[s]uch conduct ... falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself." *Id.* The difference between these cases, according to the Court, lies in the fact that in the latter case, it is "all but assure[d] that the grand jury will consider the material in its deliberations," while the "use [that] will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury *is far more speculative.*" *Id.* (emphasis added). As a consequence, the Court concluded that Aguilar's act of lying to the investigating agents "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice," and thus could not ground a conviction for the substantive offense of obstruction of justice. *Id.* For precisely this reason, if this very same act of giving false testimony to FBI agents had formed the basis of an agreement between Aguilar and another, Aguilar could not have been found guilty of conspiracy to obstruct justice *because the act he would have conspired to commit would not have been itself illegal.*

To prove a conspiracy to violate § 1503, the government must therefore show that *the actions the defendant agreed to take* would themselves violate § 1503, that is, would have " 'the natural and probable effect' of interfering with the due administration of justice" in a way that is more than merely "speculative." *Id.* As in *Aguilar,* this standard cannot encompass every agreement to deceive regarding the commission of a crime. Otherwise, every criminal who conspired at any time and in any way to conceal evidence of his or her crime would be susceptible to charges of conspiracy to obstruct justice, a result that would take us far beyond the federal interest in "preserving the integrity of a judicial proceeding" that we have elsewhere found

6

to animate § 1503. *United States v. Veal,* 153 F.3d 1233, 1250 (11th Cir.1998) ("In *Aguilar,* the Court sought to place the phrase 'due administration of justice' in the context of a legitimate federal interest that was consistent with the amorphous language used by Congress. The Court determined that the phrase 'due administration of justice' connotes the federal government's interest in preserving the integrity of a judicial proceeding.").

At the same time, the requirement that the actions defendants conspired to take have "the natural and probable effect of interfering with the due administration of justice" is not so narrow as to preclude a conspiracy to obstruct specific future judicial proceedings, for example, an agreement to bribe members of a grand jury should one be struck in the future. *See United States v. Perlstein,* 126 F.2d 789, 794 (3d Cir.1942). This was the thrust of the Third Circuit's decision in *United States v. Messerlian,* 832 F.2d 778 (3d Cir.1987). In that case, the court upheld the conviction for conspiracy to obstruct justice of several state troopers who took steps to prevent a future federal grand jury investigation into a trooper's fatal assault of an arrestee who was in custody following his arrest for drunk driving.[4] *Id.* at 784. The Third Circuit held that the defendants were properly convicted of conspiracy to obstruct justice because "the federal proceeding need not be pending at the time the conspiracy is formed" and that the government merely had to prove that "the conspirators undertook to obstruct the due administration of justice in a federal proceeding that they anticipated would commence in the future." *Id.* at 794. Because the direct object of the actions agreed to by the conspirators in *Messerlian* was to prevent or otherwise obstruct the commencement of a grand jury investigation into the circumstances surrounding the arrestee's death, we agree with the Third Circuit that sufficient evidence existed to convict the *Messerlian* defendants of conspiracy to obstruct justice. Accordingly, we disagree with the Fifth Circuit position to the extent that it holds that a conviction for

---

[4]These steps included "agree[ing] not to report the fact that [state trooper] Messerlian had assaulted [the arrestee], ... fail[ing] to provide routine information to the hospital concerning the circumstances of [the arrestee's] death, ... knowingly omitt[ing] accounts of the alleged assault from statements prepared during interviews with [several witnesses], ... fabricat[ing] a story [regarding how the arrestee came to be injured, and] ... ma[king] false declarations before the grand jury." *Messerlian,* 832 F.2d at 784 (internal quotation marks omitted).

conspiracy to obstruct justice will *always* require a pending judicial proceeding to be in existence at the time the defendants formed the conspiracy. *See Cihak,* 137 F.3d at 263.

Thus, in order to sustain a conviction for conspiracy to obstruct justice under 18 U.S.C. § 371 and 18 U.S.C. § 1503, the government need not always show that a judicial proceeding existed at the time the defendants formed the conspiracy, but must demonstrate that the actions the conspirators agreed to take were directly intended to prevent or otherwise obstruct the processes of a specific judicial proceeding in a way that is more than merely "speculative." *See Aguilar,* 515 U.S. at 601, 115 S.Ct. 2357. In formulating this standard, we remain mindful of the emphasis placed by the Supreme Court in *Aguilar* on the " 'nexus' requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings." *Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357. Processes integrally related to the administration of justice would of course include pending judicial proceedings, although we note that, as was the case in *Aguilar,* the mere fact that judicial proceedings are pending when the conspiracy to take actions alleged to obstruct justice was formed will not always be sufficient to prove the conspiracy itself. *See id.* at 601, 115 S.Ct. 2357.

Turning to the facts at hand, it is clear to us that the government's evidence falls short of what is required to ground a conviction for conspiracy to obstruct justice. Vaghela participated in the drawing up of a bogus contract, and over a year later, urged Desai to "stick with th[at] contract." At the time Vaghela and Desai drew up the contract, there was no grand jury proceeding. Although there had been some FBI investigation—the exact parameters of which were discernable neither from the government's brief nor from the record—into the payments, there is no indication that the pair had reason to anticipate further proceedings, nor that they viewed their own actions as a way to forestall them. They were simply trying to conceal the evidence of their crime.[5]

In a broad and colloquial sense, every criminal act is an obstruction of justice, as is every effort to conceal that criminal act. However, as we noted earlier, such a broad and literal reading of the definition of

_____

[5]This case is thus very different from *Messerlian. See* discussion, *supra.*

8

this criminal offense is inconsistent with *Aguilar.  See Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357 ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings;  it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority.").  While Vaghela's efforts to camouflage his own criminal conduct are far from praiseworthy, it would be stretching the language of § 1503 well beyond its intended purpose of "preserving the integrity of a judicial proceeding," *United States v. Veal,* 153 F.3d 1233, 1250 (11th Cir.1998), to allow the act of hiding incriminating evidence to serve as the basis for a conspiracy to obstruct justice.

As we saw, in *Aguilar,* the defendant also sought to hide his own wrongdoing by lying to federal agents. *See Aguilar,* 515 U.S. at 596-97, 115 S.Ct. 2357.  Yet, notwithstanding that a grand jury had already begun its investigations into that case, the Supreme Court found that the connection between Aguilar's false testimony at the time it was given and its effect on the judicial proceedings in question was too speculative to support the conclusion that it would have "the 'natural and probable effect' of interfering with the due administration of justice," *id.* at 601, 115 S.Ct. 2357.  Thus, if Aguilar had agreed with another to do exactly the same thing he was convicted of doing in *Aguilar,* he could not have been found guilty of conspiracy to obstruct justice because, as we have seen, his conviction was reversed and therefore the act he would have conspired to commit would not under *Aguilar* be itself illegal.

This is precisely the case we have here.  Vaghela and Desai certainly agreed to stick with a contract they knew to be false.  But if drawing up and asserting the veracity of a false document would not itself ground a substantive charge of obstruction of justice—and it is clear that it would not do so under *Aguilar,* which required that "the act must have a relationship in time, causation, or logic with the judicial proceedings," *Aguilar,* 515 U.S.at 599, 115 S.Ct. 2357—their agreement to do so cannot ground a conspiracy charge based on that same offense.  And because the government is therefore unable to show that the pair

9

agreed to commit one or more acts in violation of § 1503, Vaghela's conviction for conspiracy to obstruct justice must be reversed.

2.      *The Restitution Issue*

Vaghela also argues that the district court erred in calculating the amount of restitution at $50,420.02, the amount for which DHHS was billed under Medicare for work referred to Extendicare by Vaghela, rather than at $23,400, the amount Vaghela received in illegal kickbacks in exchange for the referrals.[6]  We agree.

It is well settled that restitution awarded the victim of a crime pursuant to the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3663, 3664 (1996),[7] may not exceed the loss suffered by the victim for those crimes specifically charged.  *See United States v. Stone,* 948 F.2d 700, 704 (11th Cir.1991);  *United States v. Cobbs,* 967 F.2d 1555, 1559 (11th Cir.1992).  Moreover, the government has the burden of proving by a preponderance of the evidence the amount of the loss.  *See United States v. Hairston,* 888 F.2d 1349, 1354 (11th Cir.1989).

The district court set the restitution at the full amount that DHHS paid Extendicare for the labwork referred by Vaghela—$50,420.02. Yet the government does not suggest that Extendicare did not perform the services ordered by FMC. Thus, unless we are to believe that DHHS received no value at all for Extendicare's work, a proposition for which there is no supporting evidence, we must assume that the loss suffered by DHHS is an amount equivalent to the amount it paid to Extendicare in excess of the value of services rendered.  And because Desai would not have participated in the kickback scheme if it was not profitable for Extendicare, it is not unreasonable to assume that DHHS was overcharged in the amount of the kickbacks, and that the loss DHHS suffered was equivalent to that amount.

---

[6]We review for clear error the district court's factual findings as to the amount of restitution.  *United States v. Bourne,* 130 F.3d 1444, 1446 (11th Cir.1997).

[7]These statutory provisions have been amended in the time since Vaghela's sentencing.  *See* 18 U.S.C. §§ 3663, 3663A, 3664 (1997).

The government, which bears the burden of proving otherwise, offers little or no evidence capable of doing so. Speculation that Medicare ends up paying for some medically unnecessary treatments and tests when kickbacks are provided in exchange for the referral of Medicare patients and services is insufficient to support the government's burden to prove actual losses in each particular case.

Even if we were to accept the government's argument to this effect, the evidence in this case does not come close to supporting an inference that medically unnecessary services were performed by Extendicare as a consequence of the kickback scheme. Vaghela was merely the office manager who selected the lab to perform the tests ordered by the physicians who employed him. But it was the physicians themselves who made the determinations as to which tests were necessary and which were not, and the government offers no evidence (nor, as best we can tell, is there any such evidence to offer) that Drs. Levine and Levine were party to the scheme. There is therefore no basis for concluding that any of the tests ordered from Extendicare and paid for by DHHS were anything other than medically necessary.

We therefore conclude that the government failed to prove that the amount of loss for purposes of restitution in this case was $50,420.02. Instead, we find that amount of the loss for purposes of restitution suffered by DHHS as a result of Vaghela's illegal conduct is equivalent to the amount he received in kickbacks, and not the amount paid to Extendicare for services rendered Medicare.

CONCLUSION

For the foregoing reasons, we hold that there was insufficient evidence to support Vaghela's conviction for conspiracy to obstruct justice in violation of 18 U.S.C. § 371, and find that the district court erred in its determination that the amount of restitution owed was $50,420.02 and not $23,400. We therefore REVERSE Vaghela's conviction for conspiracy to obstruct justice, AFFIRM his conviction on all other counts, VACATE the order for restitution in the amount of $50,420.02, and REMAND to the district court for resentencing consistent with this opinion.

11