In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-2151, 04-2253

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER R. MACARI and ALBIN C. BRENKUS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 1061—**Suzanne B. Conlon**, *Judge*.

ARGUED APRIL 14, 2005—DECIDED JULY 14, 2006

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges*.

COFFEY, *Circuit Judge*. On November 6, 2003, a federal grand jury returned a fourteen-count indictment against Albin Brenkus, Peter Macari, and seven other members (or prospective members) of a Chicago projectionist union, known as Local 110, on charges of arson and, in Brenkus's case, obstruction of justice. A jury acquitted Brenkus of the arson-related charges but convicted him of obstruction of justice, and he was sentenced to a term of seventy-eight months. On appeal, Brenkus challenges the sufficiency of the evidence presented on his 18 U.S.C. § 1503 obstruction of justice conviction as well as the district

court's jury instructions on the obstruction of justice count.[1] We affirm the judgment of the district court as it relates to Brenkus.

Prior to trial, Macari pled guilty to one count of conspiracy to promote arson in interstate travel and one count of aiding and abetting arson and was sentenced to a term of forty-six months. Thirty-six months of Macari's sentence were to be served concurrently with a ten-year Illinois state sentence he was presently serving on a related, attempted first degree murder charge, and the remaining ten months of his federal sentence were to be served consecutive to his state sentence. Macari appeals only the ten-month portion of his federal sentence that he was ordered to serve consecutive to his state sentence.

Because we are unable to ascertain from the record whether the district court would have imposed the same sentence on Macari under an advisory guideline scheme, we order a limited remand, with respect only to the question of whether his ten-month consecutive sentence is in accordance with the procedures outlined in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

---

[1] Initially, Brenkus also challenged his sentence as violative of *Blakely v. Washington*, 542 U.S. 296 (2004), and as miscalculated under the Guidelines; however, on February 7, 2005, after the Supreme Court announced its decision in *United States v. Booker*, 543 U.S. 220 (2005), Brenkus withdrew his Sixth Amendment challenge to his sentence in his supplemental brief, stating: "Brenkus waives any right he may have to resentencing under the Supreme Court's decision in *Booker*, and hereby waives his challenge to his sentence." Thus, this issue is no longer before this court.

## I. Background

### A. Incendiary Attacks

In 1998, the Motion Picture Projectionists, Operators, and Video Technicians, Local 110 of the International Alliance of Theatrical Stage Employees of the United States and Canada, AFL-CIO ("Local 110"), was comprised of approximately 350 members. From late 1997 through 2001, Brenkus was the secretary-treasurer of Local 110 and served as Local 110's second-in-command, and his duties included the negotiation and renegotiation of collective bargaining agreements between Local 110 and various theater companies.

In 1998, Local 110 faced two major problems. AMC Entertainment, Inc. ("AMC"), a Chicago area theater company, refused to enter into a collective bargaining agreement with Local 110.[2] Also, Local 110's contracts with two other Chicagoland theater companies—Loews Theaters Exhibition Group ("Sony/Loews") and Cineplex Odeon Corporation ("Cineplex")—were about to expire, and if new contracts could not be negotiated, the union was fearful other jobs would be lost. To induce the theater companies to renew or enter into agreements, Brenkus and other mem-

---

[2] In the mid-1990's, Local 110 had entered into a collective bargaining agreement with AMC, but sometime prior to 1998, AMC sold all of its Chicago theaters and its contract with Local 110 expired. In 1998, AMC re-entered the Chicago theater market, and Local 110 attempted to rekindle its relationship with AMC. Unfortunately for the members of Local 110, AMC failed to respond to any advancements by Local 110, making clear that it had no intention of re-entering into any collective bargaining agreement with Local 110. AMC's presence in the Chicago suburbs caused a problem for Local 110 not only because AMC refused to hire its members, but also because AMC's actions inspired Sony/Loews to question whether it should renew its own contract with Local 110.

bers of Local 110 began a coordinated campaign to put pressure on the theater companies. Initially, the campaign involved a public relations effort, including the advertising of the labor conflict through the picketing of theaters; however, after this proved unsuccessful, the campaign evolved into acts of vandalism on the part of the union designed to cause economic harm.

In February of 1998, Brenkus discussed the concept of the use of an incendiary device to Kent Dickinson, a Local 110 projectionist and fellow union negotiating committee member.[3] According to Dickinson, Brenkus planned to use the apparatuses in the two Chicago area AMC theaters in hope of conveying a clear message to AMC. Dickinson asked Carl Covelli, another Local 110 member, to enlist two non-union members (referred to at trial only as "Covelli's boys") to assist Dickinson. On the evening of March 29, 1998, Dickinson planted two incendiary devices at an AMC theater in Warrenville, Illinois, while Covelli's boys conducted a simultaneous strike in Barrington, Illinois. The media uncovered the motive for this felonious conduct, and these tactics generated a large amount of negative publicity against Local 110. Thus, shortly after the publicity relating to these two incidents, Brenkus ordered Dickinson to cease incendiary operations in the Chicago area.

According to Dickinson, in order to pressure Loews to renegotiate a contract with Local 110, Brenkus decided that

---

[3] The incendiary devices used by Local 110 members consisted of a combination of chlorine tablets and brake fluid. The resulting mixture often produced smoke with a strong chlorine smell and visible flames. An important feature of the incendiary devices was the delay between combining the ingredients and any noticeable production of smoke and smell. The time delay allowed members of Local 110 to place a device in a darkened auditorium and exit several minutes before patrons and theater employees realized the vandalism had occurred.

more acts of vandalism were necessary. However, to avoid the negative publicity that resulted from the prior attacks, Brenkus ordered new acts of intimidation and violence to occur outside of the Chicago area. On June 7, 1998, Dickinson and another Local 110 member, Peter Lipa, traveled to Indianapolis, Indiana, where Dickinson placed incendiary instruments in two Loews theaters. Then, on July 24, 1998, Local 110 members Joseph Marjan and Gregory Tortorello, Jr. set off smoke producing flares in a Loews theater in Streamwood, Illinois, and on August 2, 1998, Dickinson and Marjan discharged incendiary devices in a Loews theater in Beavercreek, Ohio.

After the Ohio incident, Brenkus expressed his dissatisfaction with the lack of success with the intimidation tactics, noting that they were not having the desired effect as Loews continued to refuse to negotiate a new contract with the Local. Despite his complaints about the lack of success of their approach, Brenkus instructed Dickinson to set off an incendiary gadget at Loews' flagship theater in New York, New York, in August of 1998. Shortly after this episode, Loews decided to resume contract negotiations with Local 110. However, Loews delayed signing the new contract, and, as a result, Brenkus instructed Dickinson to execute another incursion against Loews. On October 3, 1998, Dickinson and Marjan discharged an incendiary device in two Loews theaters in Secaucus, New Jersey, and, shortly thereafter on October 27, 1998, Loews entered into a collective bargaining agreement with Local 110.

In late 1998, a fourth theater company, Cinemark, U.S.A., Inc. ("Cinemark"), entered Chicago's first-run theater market,[4] and Local 110 sent letters of introduction to Cinemark management in an effort to initiate contract negotiations. Despite repeated requests, Cinemark refused

---

[4] First-run theaters show only newly released films.

to negotiate with Local 110. Thus, in order to induce negotiations, and encouraged by the perceived capitulation of Loews, Local 110 members began targeting Cinemark. On November 14, 1998, Marjan planted incendiary instruments in a Cinemark theater in North Aurora, Illinois, and, on December 5, 1998, he placed incendiary devices in a Cinemark theater in Joliet, Illinois. On February 27, 1999, Dickinson and Marjan set off an incendiary invention in a Cinemark theater in North Canton, Ohio, and on April 3, 1999, they struck two other Cinemark theaters in Lexington, Kentucky. On May 15, 1999, Dickinson, Marjan, and Michael Rossi, another one of "Covelli's boys" who did not belong to Local 110 at the time but hoped to "earn" or gain his way in, placed incendiary devices in two Cinemark theaters in Dallas, Texas, and in two theaters near Cinemark's headquarters in Plano, Texas.

After waiting several weeks without a response from Cinemark, on June 6, 1999, Dickinson and Marjan struck a Cinemark theater in Mishawaka, Indiana, and on June 27, 1999, they struck another Cinemark theater in Kenosha, Wisconsin. On July 10, 1999, Dickinson traveled alone to Ames, Iowa, to carry out yet another strike on a Cinemark theater, and a final assault occurred on August 20, 1999, against one of their theaters in Merriam, Kansas. After the Kansas trip, Dickinson informed Brenkus that he and Marjan would no longer participate in the planting of any more incendiary apparatuses, and Brenkus agreed, instructing Dickinson to stop the offensive due to increased investigatory "heat."

## B. Assault of Theater Manager Leyland

According to the witnesses, in addition to the plan of intimidation through the use of incendiary devices, throughout the summer of 1999, members of Local 110 picketed in front of non-union theaters, including a Cinemark theater

in Melrose Park, Illinois. Cinemark's corporate headquarters instructed Jeffrey Leyland, the Melrose Park Cinemark theater manager at the time, to photograph the union picketers. According to Covelli, in response to Leyland's actions, Brenkus began taking pictures of Leyland and asked Covelli if he "could get somebody to slap [Leyland] around." Covelli contacted his brother, Louis, and Louis contacted a Peter Macari, who, at the time, was training to become a union projectionist. In July or August of 1999, Louis and Carl Covelli met with Macari. At that meeting Carl Covelli informed him that before he could start working as a union projectionist, "the boss" needed him to "send a message to [Leyland]" by "giving him a beating."[5] After mulling the matter over for a week, Macari agreed to fulfill or participate in the requested assault in exchange for a promise of employment with the union.

On the morning of August 18, 1999, Macari ambushed Leyland outside of his home in Elmhurst, Illinois, and struck him "three times" with a baseball bat, including once in the head. As a result of the beating, Leyland suffered multiple skull fractures, a broken arm, and broken fingers.[6] On August 20, 1999, Brenkus personally thanked Macari and remarked, "I think [Leyland] got the message. I'm going to recommend that you start working probably starting the following week." Despite this assurance, Macari never did work as a union projectionist for the Illinois State Police and the FBI began investigating his participation in the Leyland assault resulting in his arrest on June 13, 2003. After his arrest, he received $5,000 from Local 110 to retain counsel. On June 16, 2003, Macari pled guilty to an Illinois

---

[5]  Macari testified that "the boss" was Brenkus.

[6]  At sentencing, the parties stipulated that Leyland suffered life-threatening or permanent injuries within the meaning of Guideline § 2A2.2., and that a baseball bat was used in the assault.

state charge of attempted first degree murder and was sentenced to ten years' imprisonment.

## C. Investigation

James Grady, a special agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), began investigating Local 110 in 1998 for an unrelated incendiary gadget incident but the initial investigation went stale shortly after the case was opened. He did not pursue Local 110 again until early 2003 when he interviewed Gregory Tortorello about the incendiary attacks against the theaters. Although he noted that he was not personally involved with the theater probe until 2003, Grady testified during Brenkus's trial that "other federal agencies" had been conducting investigations into the incidents between "2001 and 2003."

Special agent John Mallul of the Federal Bureau of Investigation ("FBI") began looking into Local 110 in 2001. He was involved in a proffer session with Dickinson in September of 2002, and on November 19, 2002, he acquired evidence from the Warrenville Police Department regarding property vandalism to the AMC theater in Warrenville, Illinois, that occurred in March of 1998. By 2003, there was a grand jury investigation into Local 110's role in the theater attacks that had been "ongoing" and that the FBI's investigation resulted in the grand jury's indictment of Local 110 members on arson and obstruction of justice charges. Special agent John Malooly of the ATF likewise testified that the FBI had been investigating the use of incendiary devices as far back as 2001. He noted that on October 9, 2001, FBI chemist Ronald Kelly prepared a report concerning the chemical properties of the incendiary devices used by Local 110 members for use in the investigation.

Jody Colangelo, Local 110's office manager from 1995 through June of 2000, verified that in August of 1999, Local

110 received a subpoena from the FBI requesting Local 110's "records, lists of names, phone numbers, rosters, [and] things of that nature." The subpoena was issued under the name of the SPECIAL JANUARY 1999-1 Grand Jury ("1999 Special Grand Jury subpoena"). Colangelo stated that when she received the 1999 Special Grand Jury subpoena, she made two copies and provided one copy to Steve Spano, the president of Local 110, and the other copy to Brenkus. According to Colangelo, after she gave copies to Spano and Brenkus, she met with them to discuss the items ordered to be turned over in compliance with the subpoena.

Joseph Marjan disclosed that in March of 2001, FBI agents contacted him and requested his cooperation with the investigation into Local 110's acts of vandalism on theaters. Marjan agreed to assist and cooperate with the FBI and he proceeded to meet with FBI agents more than twenty times from March 2001 until "about the grand jury."[7] He also revealed that, around the same time he began cooperating with the FBI, he met with assistant United States attorneys from the Northern District of Illinois to discuss Local 110's activities in 1998 and 1999.

At the request of FBI agents, Marjan agreed to record his conversations with union members believed to be involved in the incendiary scheme, including Dickinson and Brenkus. On June 5, 2001, Marjan recorded a conversation with Dickinson, at which time Dickinson admitted his involvement in several of the crimes.[8] Then, on October 22, 2001,

---

[7] The "grand jury" that Marjan referred to in his testimony was the Special February 2002-2 Grand Jury, convened in February of 2002, that indicted Brenkus and other Local 110 members.

[8] According to Marjan, his tape recorded conversation with Dickinson gave the government "a lot of evidence about what Kent

(continued...)

Marjan recorded a conversation between he and Brenkus
after a Local 110 meeting at the union's headquarters in
Chicago. According to Marjan, after the meeting they
retreated to a utility room in the building to discuss the
incendiary attacks. During this conversation, Marjan told
Brenkus that Scott Fagan, another union projectionist, had
revealed to him that "Covelli was involved in the grand jury
and . . . you know, he's the second person this month."
Marjan then asked Brenkus, "[S]hould I be scared?" Marjan
understood Brenkus's response and direction to be "if
anyone came to me [Marjan], any law enforcement comes to
me tell them that I don't know nothing" and to deny any
knowledge of any illegal activities conducted by Local 110.[9]
Marjan and Brenkus also discussed Rossi's training as a
projectionist. Marjan testified that Brenkus told him that
if "law enforcement" ever asked him whether he had trained
Rossi, he was to deny it.

---

[8]  (...continued)
Dickinson did and said and knew" regarding the scope of Local
110's incendiary activities.

[9] The exact transcription of the audiotape is disputed by the
parties. The parties provided separate transcripts of the re-
corded conversation at trial. However, due to the inconsistencies
found in the submitted transcripts, only the actual audiotape of
the recorded conversation was admitted into evidence and not the
transcripts. According to Marjan and the government, during
their conversation Brenkus said, "I think you should say you don't
know nothing," and "just play stupid." Brenkus argues that in the
recording you only hear Brenkus state to Marjan, "[Y]ou don't
know nothing," and that Brenkus never preceded this phrase with
"I think you should say," nor did he tell Marjan to "just play
stupid." According to Marjan, the difficulty in deciphering the
audiotape is due to the fact that the utility room in which he and
Brenkus talked contained equipment that exuded "a loud exhaust
sound."

On October 27, 2001, a few days after Marjan's recorded conversation with Brenkus, FBI agents served Dickinson with a subpoena to appear before the grand jury then sitting. The following day, Dickinson met with Brenkus to discuss his subpoena and visit from the FBI. According to Dickinson's trial testimony, Brenkus said that he also received a grand jury subpoena. The next month, in November of 2001, Dickinson met with government representatives to discuss his involvement in the incendiary attacks.[10] From November of 2001 until May 23, 2002—the date Dickinson testified before the February 2002-2 Special Grand Jury that indicted Brenkus— Dickinson participated

---

[10] It is unclear from the trial testimony to whom Dickinson was referring when he said that he met with "the government." However, it is clear from the following exchange that he was not referring to the FBI:

Q:  Now, this wasn't the first time that you sat and met with the government and [FBI] agents and told them about these activities, was it? You met with them earlier, isn't that true?

A:  I'm going to say yes because you said earlier that [that] was my second [meeting.]

Q:  In fact, you met with them November 21st of 2001.

A:  Okay, that would be the first visit, okay.

Q:  Maybe I can help you. The FBI visited with you in October of 2001?

A:  Right. Correct.

Q:  And then the next month you met with the government, correct?

A:  Correct.

Q:  And you had a lengthy discussion with them on that date, correct?

A:  Yes.

in "several" meetings with both the FBI and other unidentified government officials, providing them with detailed information about the incendiary attacks.

### D. Brenkus's Trial and Sentencing

On November 6, 2003, a federal grand jury returned a fourteen-count indictment against Brenkus, charging him with thirteen counts of arson-related offenses (Counts 1 through 13), stemming from the use of incendiary devices in theaters, and one count of obstruction of justice in violation of 18 U.S.C. § 1503 (Count 14), based on Brenkus's recorded statements to Marjan. Brenkus pled not guilty to all charges, and his case was tried before a jury beginning on March 1, 2004.

At the close of the evidence offered at trial, Brenkus proffered a set of proposed jury instructions to the district court on Count 14. Specifically, Brenkus requested that the jury be instructed that in order to find him guilty of obstruction of justice based on his statements to Marjan, they had to find that Marjan "was a [grand jury] witness" and that Brenkus "endeavored to influence, intimidate, and impede Joseph Marjan by advising him to lie on account of his being a witness."[11] The district court re

---

[11] Brenkus's proposed instruction was modeled after a Seventh Circuit Pattern Criminal Federal Jury Instruction for a § 1503 obstruction of justice charge—Influencing or Injuring a Witness—which states, in relevant part:

> To sustain the charge of obstruction of justice, the government must prove the following propositions:
>
> First, that (name) was a witness;
>
> Second, that the defendant endeavored to [influence, intimidate, impede] (name) by (here insert act as described in the
>
> (continued...)

jected Brenkus's proposed instruction on Count 14, noting that influencing an actual witness is but one way to prove obstruction of justice. Instead, the district court followed the general, "catch-all"[12] Seventh Circuit Pattern Criminal Jury Instruction for obstruction of justice and instructed the jury as follows:

> To sustain the charge of obstruction of justice, the government must prove the following propositions:
>
> First, that the defendant endeavored to influence, obstruct, and impede the due administration of justice by directing and advising Joseph Marjan that in response to any inquiries in a federal grand jury investigation
>
> > (a) Marjan should state that he "don't know nobody," and that he "don't know nothin,"
> >
> > (b) Marjan should further respond to any such inquiries by stating, "I don't know what you're talking about,"
> >
> > (c) In response to any inquiries regarding the projectionist training provided by Marjan and others to Michael Rossi, Marjan should state that he "didn't try to train nobody."

---

[11] (...continued)
    indictment) on account of his being a witness;

    Third, that the defendant acted knowingly; and

    Fourth, that the defendant's acts were done corruptly, that is, with the purpose of wrongfully impeding the due administration of justice.

[12] The term "catch-all" is referenced in the Seventh Circuit's form jury instructions. "This instruction is for use when the omnibus, or catch-all, provision of Section 1503 is used." 2A Kevin O'Malley, et al., Federal Jury Practice & Instructions § 48.03 (5th ed. 2000), notes, Seventh Circuit, committee comment. *See also United States v. Aguilar*, 515 U.S. 593, 598 (1995).

Second, that the defendant acted knowingly; and

Third, that the defendant's acts were done corruptly, that is, with the purpose of wrongfully impeding the due administration of justice.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you must find the defendant not guilty.

The jury acquitted Brenkus of the arson-related charges (Counts 1 through 13) but found him guilty of obstruction of justice.

On May 1, 2004, the district court conducted Brenkus's sentencing hearing. Based on the testimony of Leyland, Covelli, and Macari, the trial judge enhanced Brenkus's base offense level for obstruction of justice from twelve to twenty-six and sentenced him to a prison term of seventy-eight months, the maximum term allowed under the Guidelines for a person without a criminal history and consisted of an offense level of twenty-six.

## E.  Macari's Sentence

The grand jury indictment of November 6, 2003, also charged Macari with three counts of arson, including one count of conspiracy to travel interstate to promote arson in violation of 18 U.S.C. § 371 (Count 2) and two counts of aiding and abetting travel in interstate commerce to promote arson in violation of 18 U.S.C. § 1952(a)(3) (Counts

10 and 13).[13] On February 9, 2004, Macari pled guilty, without entering into a plea agreement, to Counts 2 and 13, and the district court, on the government's motion, dismissed Count 10. The district court sentenced Macari to a prison term of thirty-six months on Count 2, to be served concurrently with his ten-year Illinois state prison sentence for the attempted first degree murder of Leyland, and a term of ten months imprisonment on Count 13, to be served consecutive to his Illinois state prison sentence. Macari appeals only the ten-month consecutive prison sentence.

## II. Analysis

On appeal, Brenkus contends that the district court erred in denying his motion for judgment of acquittal arguing that the government failed to establish either that there was a "pending judicial proceeding" at the time of Brenkus's alleged obstruction or that Brenkus "corruptly intended" to influence that judicial proceeding as required for a conviction under 18 U.S.C. § 1503. He also claims that the district court erred when it refused to accept his proposed jury instruction on his theory of the obstruction count and failed to *sua sponte* provide limiting instructions to the jury regarding Marjan's recorded statements to Brenkus. Brenkus did not request these limiting instructions at trial.

The only issue raised by Macari on appeal is whether the trial judge abused her discretion when she sentenced him to

---

[13] Covelli, Dickinson, Lipa, Marjan, Rossi and Tortorello were also named in the November 6, 2003, indictment and were charged with various arson-related crimes. Covelli, Dickinson, Marjan and Rossi all either pled guilty to their respective charges or the government voluntarily dismissed their charges. Lipa and Tortorello pled not guilty, were tried in the same trial as Brenkus, and were eventually acquitted of all charges against them.

a ten-month federal prison sentence to be served consecutive to his ten-year Illinois state prison sentence.

## A.  Defendant Brenkus

### 1.  Sufficiency of the Evidence

We review *de novo* the district court's decision to deny a motion for judgment of acquittal. *United States v. Jones*, 222 F.3d 349, 351-52 (7th Cir. 2000). In reviewing a jury conviction for sufficiency of the evidence, we consider the evidence in the light most favorable to the prosecution, drawing all reasonable inferences in the government's favor. *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). Reversal is appropriate only when, after viewing the evidence in such a manner, no rational jury "could have found the defendant to have committed the essential elements of the crime." *Id.* (quoting *United States v. Masten*, 170 F.3d 790, 794 (7th Cir. 1999)). Thus, we will overturn the jury's verdict "'only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003) (quoting *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir. 1998)).

Brenkus was convicted of obstruction of justice for violating the "Omnibus Clause," or "catch-all provision," of 18 U.S.C. § 1503 charging that he directed and advised Joseph Marjan to lie in response to inquiries in the grand jury investigation of Local 110's criminal activities. The "Omnibus Clause" of § 1503 makes it a crime to "corruptly . . . endeavor[ ] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503. "[T]he due administration of justice," as that phrase is used in the statute, includes pending judicial proceedings. *United States v. Aguilar*, 515 U.S. 593, 599 (1995); *Fassnacht*, 332

F.3d at 447. Accordingly, to prove an obstruction of justice charge under § 1503, the government must demonstrate "that there was a pending judicial proceeding, that the defendant was aware of that proceeding, and that the defendant corruptly intended to impede the administration of that judicial proceeding." *Fassnacht*, 332 F.3d at 447. Brenkus asserts that the government failed to establish there was a pending judicial proceeding because it failed to prove that a grand jury had been impaneled at the time of Brenkus's alleged act of obstruction of justice, and, furthermore, that even if the government had produced sufficient evidence to establish that a grand jury was sitting at the time of Brenkus's obstruction, it failed to establish that Brenkus corruptly intended to influence the grand jury.

It is well established that a grand jury investigation constitutes a pending judicial proceeding for purposes of § 1503. *Id.* at 448. However, a government agency's investigation—such as the FBI's—that is separate and apart from the court's or the grand jury's authority does not constitute a "judicial proceeding." *Id.* (citing *Aguilar*, 515 U.S. at 599). In order to establish that an FBI investigation constituted a "judicial proceeding" for purposes of § 1503, the government must establish that the FBI, at the time in question, was acting as an aid to and as an "arm of the grand jury" when it conducted its investigation, *i.e.*, that it undertook the investigation to supply information to the grand jury on this issue in direct support of a grand jury investigation. *Id.* at 449. To establish that the FBI was acting as an arm of the grand jury, the government must demonstrate that the FBI agents were "integrally involved" in the grand jury investigation, *Fassnacht*, 332 F.3d at 449 (quoting *United States v. Furkin*, 119 F.3d 1276, 1282-83 (7th Cir. 1997)), and that the FBI's investigation of Local 110's activities was "undertaken with the intention of presenting evidence before [the] grand jury," *United States v. Maloney*, 71 F.3d 645, 657 (7th Cir. 1995) (citing *United States v. McComb*, 744 F.2d 555, 561 (7th Cir. 1984)).

The testimony of a number of witnesses at trial supports the finding that between August of 1999 and November of 2003 (when the indictment was returned against Brenkus and other members of Local 110), the FBI was gathering and presenting evidence sporadically to a grand jury investigating Local 110's criminal activities. Based upon the testimony of Jody Colangelo, Local 110's office manager from 1995 through June of 2000, the jury could very well have reasoned that a grand jury investigation into Local 110 began as early as August of 1999, when the FBI served Local 110 with a grand jury subpoena requesting its "records, lists of names, phone numbers, rosters, [and] things of that nature."[14] Colangelo testified that after receiving the subpoena, she provided copies of it to Spano and Brenkus and then met with the two of them to discuss how to respond. Additionally, Dickinson testified that in September of 1999, he informed Brenkus that he and Marjan would not participate in any future attacks because they "were just worn out." In response, Brenkus agreed that the attacks should cease due to increased investigatory "heat" and that they should "just stop everything." The testimony of Colangelo and Dickinson coupled with the grand jury subpoena from August of 1999 provide evidence from which the jury could find that a grand jury investigation into Local 110's theater attacks existed as early as 1999 and continued for some period of time and, additionally, that Brenkus had knowledge of the inquiry.

Additional evidence was presented that the 1999 investigation continued into 2001 and beyond. In March of 2001, FBI agents contacted Marjan and asked him to cooperate in the investigation into Local 110's incendiary attacks on theaters. Marjan testified at trial that from March 2001 until "about the grand jury," he participated in several FBI

_____

[14] Although the FBI delivered the subpoena, it was issued under the name of the SPECIAL JANUARY 1999-1 Grand Jury.

interviews and recorded conversations he had with both Dickinson and Brenkus for the purpose of gathering information related to Local 110's incendiary attacks at selected theaters. Additionally, special agent James Grady of the ATF testified that although he was not personally involved in the Local 110 investigation until 2003, other federal agencies had been conducting investigations into the incidents between 2001 and 2003. Another ATF agent, John Malooly, testified that on October 9, 2001, FBI chemist Ronald Kelly prepared a report concerning the chemical properties of the incendiary instruments used by Local 110 members. The jury could very well have reasonably inferred that one purpose for the preparation of Kelly's report was to present it to the grand jury.

Then, on October 27, 2001, just five days after Marjan's recorded conversation with Brenkus, FBI agents approached Dickinson at a gas station near his place of employment and played a tape of the incriminating conversation between he and Marjan that occurred on June 5, 2001. After the agents played the tape, they served Dickinson with a subpoena to appear before a grand jury. The next day, Brenkus informed Dickinson that he also had received a grand jury subpoena. The following month, in November of 2001, Dickinson was asked to and began cooperating in the federal investigation. He stated that from November 2001 until he testified before the February 2002 Special Grand Jury that indicted Brenkus, he participated in several meetings with counsel for the government and the FBI and provided them with detailed information on Local 110's involvement in criminal activity including the vandalism of property and obstruction of justice. Of particular significance is the fact that FBI agents served Dickinson with a grand jury subpoena immediately after they played him the tape of the conversation with Marjan and that Brenkus was served with a grand jury subpoena that same day (or, at the latest, the next morning). This evidence,

taken in the light most favorable to the prosecution, sufficiently demonstrates that the FBI's investigation had been undertaken with the intention of providing evidence to the grand jury. *Maloney*, 71 F.3d at 657.

Brenkus argues, relying on *United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999), that the subpoenas issued to Dickinson and Brenkus do not establish that a judicial proceeding was pending at the time of Brenkus's obstruction because they were served five days after the obstruction date and they had not yet appeared before the grand jury. However, in *Vaghela*, there was no evidence to establish that *any* grand jury had been impaneled prior to the date the defendants allegedly obstructed justice. *Vaghela*, 169 F.3d at 735. Conversely, in this case, the government presented evidence that in January of 1999, a grand jury had been impaneled to investigate into Local 110's activities. The jury could have rationally concluded, given the aforementioned evidence, that the original grand jury's term had been extended or that a subsequent grand jury had been impaneled to continue the ongoing investigation of Local 110. *See, e.g.*, 18 U.S.C. § 3331(a).[15] As we have previously stated, "[t]he practice of transferring records and cases to subsequent grand juries is common." *McComb*, 744 F.2d at 561 n. 5, 558.

Contrary to Brenkus's argument, the temporal proximity between Marjan's recorded conversation with Brenkus and the issuance of grand jury subpoenas to Dickinson and Brenkus actually adds further support to the government's position that Marjan's wired conversation with Brenkus was part and parcel of the investigation under-

---

[15] Although a special grand jury's term is ordinarily eighteen months, the term may be extended to up to thirty-six months if the district court determines that the sitting grand jury had not completed its business during the original term.

taken with the intention of presenting evidence before
an ongoing grand jury proceeding. *See McComb*, 744 F.2d at
560-61 ("Rather than establish a rigid rule denominating
some act of the grand jury that would be required to
establish pendency, courts have asked 'whether the sub-
poena is issued in furtherance of an actual grand jury
investigation, i.e., to secure a presently contemplated
presentation of evidence before the grand jury.'"); *United
States v. Simmons*, 591 F.2d 206, 208 (3d Cir. 1979) (gov-
ernment need not demonstrate that the grand jury "has
actually heard testimony or has in some way taken a role in
the decision to issue the subpoena"). The existence of the
1999 grand jury as well as the issuance of grand jury
subpoenas so closely on the heels of Brenkus's conversation
with Marjan sufficiently demonstrates an effort by the FBI
to secure a "presently contemplated presentation of evi-
dence before the grand jury." This is particularly true since
Brenkus challenges the sufficiency of the evidence, and
reversal is only appropriate if there is no evidence in the
record on this issue. *See Fassnacht*, 332 F.3d at 447.
Considering the standard of review to view the evidence in
the light most favorable to the prosecution and the evidence
presented at trial, we reject Brenkus's contention that the
government failed to present sufficient evidence that a
"pending judicial proceeding" existed on October 22, 2001.

   In addition to establishing a pending judicial proceeding,
§ 1503 requires the prosecution to demonstrate that
Brenkus "corruptly intended" to impede the administration
of the judicial proceeding in question. In *United States v.
Aguilar*, the Supreme Court fashioned this requirement
as a "nexus" between the accused's actions and the judicial
proceeding. 515 U.S. at 599. The "nexus" limitation is best
understood as a connection between the defendant's
intentional acts and the likelihood of potentially affect-
ing the administration of justice:

   The action taken by the accused must be with an intent
   to influence judicial or grand jury proceedings; it is not

enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. Some courts have phrased this showing as a "nexus" requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings. In other words, the endeavor must have the "natural and probable effect" of interfering with the due administration of justice. This is not to say that the defendant's actions need be successful; an "endeavor" suffices.

*Aguilar,* 515 U.S. at 599 (citations and quotations omitted); *see also United States v. Quattrone*, 441 F.3d 153, 170-71 (2d Cir. 2006). Applying this standard, the Court in *Aguilar* struck down the obstruction of justice conviction of a United States District Court judge who provided false statements to an investigating agent where the agent had "not been subpoenaed or otherwise directed to appear before the grand jury." 515 U.S. at 601. The Court vacated the conviction because the false statements could not "be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.*

Brenkus compares his statements to Marjan—who, at the time of his recorded conversation with Brenkus, had not yet been subpoenaed to testify before the grand jury—to those made to the FBI agents by the *Aguilar* defendant. In essence, Brenkus argues that because there was no evidence presented that Marjan had been subpoenaed at the time of the recorded conversation (and therefore was only a *potential* grand jury witness), Brenkus could not have intended to interfere with the grand jury's proceedings when he instructed Marjan to lie to the grand jury. However, this argument mischaracterizes *Aguilar*'s holding. Contrary to Brenkus's assertion, the *Aguilar* court did not draw a line between subpoenaed or "actual" and non-subpoenaed or "potential" witnesses. *See id.* at 600-01. Rather, the Court focused on the defendant's intent to

obstruct the administration of justice when he performed the alleged act of lying to investigating FBI agents forming the basis for the obstruction of justice charge. *See id.* at 598-601. Because the FBI agents in *Aguilar* had not been subpoenaed when the defendant lied to them, the Court held that it was speculative at best as to whether the defendant knew that his false statements would ever reach the grand jury and therefore his actions—lying to the FBI agents—would not have had the "natural and probable effect" of impeding the grand jury investigation. *Id.* at 601.

In contrast, during their recorded conversation on October 22, 2001, Brenkus instructed Marjan to lie to the grand jury concerning the contents of the criminal activities of Local 110. In the recording, Marjan can be heard telling Brenkus that "Covelli was involved in the grand jury and Covelli got, you know, he's the second person this month," and then asking Brenkus, "[S]hould I be scared?" In response, Brenkus stated, "I think you should say you don't know nothing," and to "just play stupid." Then, in discussing possible inquiries into the training of union members such as Michael Rossi, Brenkus instructed Marjan to say that he "didn't try to train nobody."[16] A rational trier of fact could conclude beyond a reasonable doubt that Brenkus made the statements with the intention of obstructing the grand jury's investigation because there was a logical relationship between his knowing conduct—directing Marjan to fabricate—and the effect it was likely to have—keeping information from reaching the grand jury.

Obviously, Brenkus's recorded statements to Marjan are more than sufficient to establish that he intended to

---

[16] Although the parties contest the precise wording of Brenkus's responses to Marjan, the jurors, having listened to the tape, were free to accept or reject Brenkus's proposed version of the conversation, and, in our review, we consider the evidence in the light most favorable to the prosecution.

affect the outcome of the grand jury investigation into Local 110.[17] Because the government presented evidence that Brenkus was aware of the pending grand jury investigation, *see supra* pp. 17-21, and because Brenkus's own words demonstrate that he intended to impede that investigation, we conclude that the government sufficiently established that Brenkus "corruptly intended" to impede the due administration of justice under § 1503 of the U.S. Federal Code.

## 2.  Jury Instructions

The district court, following the general, "catch-all" Seventh Circuit Pattern Criminal Jury Instruction for obstruction of justice, instructed the jury, in relevant part, that in order to find Brenkus guilty of obstruction of justice under § 1503, they had to find that Brenkus

> endeavored to influence, obstruct, and impede the due administration of justice by directing and advising Marjan that in response to any inquiries in a federal grand jury investigation . . . Marjan should state that he 'don't know nobody,' and that he 'don't know nothin,' . . . should further respond to any such inquiries by stating, 'I don't know what you're talking about,' [and] should state that he 'didn't try to train nobody.' "

---

[17] The fact that Marjan was already cooperating with law enforcement at the time Brenkus instructed him to lie, and thus he never actually lied to the grand jury, does not relieve Brenkus of liability under § 1503. The statute makes it a crime to "endeavor" to obstruct justice; it does not require that the defendant actually obstructed justice. *See Aguilar*, 515 U.S. at 601-02 ("[§ 1503] makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way.").

*See supra* pp. 12-13 (full text of instruction). Brenkus contends that the district court erred in giving this instruction and in refusing his proffered jury instruction on § 1503, which stated that in order to find Brenkus guilty of obstruction of justice the jury had to find that Marjan "was a witness" and that Brenkus "endeavored to influence, intimidate, and impede Joseph Marjan by advising him to lie on account of his being a witness." *See supra* p. 11 n. 10.

A defendant is entitled to an instruction on his theory of the case if the proposed instruction meets the following criteria: (1) it is an accurate statement of the law; (2) it is supported by the evidence; (3) it reflects a theory of the defendant's case which is not already part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial. *United States* v. *Boykins*, 9 F.3d 1278, 1285 (7th Cir. 1993). Brenkus's proposed instruction fails the first criteria, that it be an accurate statement of law. The proffered instruction was based on Brenkus's contrived reading of *Aguilar* that draws a line between actual and potential grand jury witnesses. *See Aguilar*, 515 U.S. at 600-01. In Brenkus's view and mischaracterization of the relevant statute and case law, he could not have intended to obstruct justice if Marjan had not been subpoenaed and was not an actual grand jury witness. As previously discussed, that is not the holding of *Aguilar*. *See id.* Rather, to prove that Brenkus obstructed justice, the government was required to show that Brenkus intended to engage in conduct that would have had the "natural and probable" effect of impeding the administration of the grand jury proceeding. *Id.* at 599. Directing even a potential witness to lie directly to the grand jury could very easily have had the "natural and probable effect" of *intending* to impede the grand jury's proceedings, and the government was only required to show Brenkus's intention. Thus, Brenkus's proposed instruction was not a correct statement of law as applied to this case.

Brenkus next claims that the trial judge erred when she failed *sua sponte* to provide a limiting instruction when she admitted into evidence Marjan's statement to Brenkus that he heard that "Covelli was involved in the grand jury and Covelli got, you know, he's the second person this month." According to Brenkus, this statement was inadmissible hearsay and thus could not be considered for the truth of the matters asserted (that Covelli was the second person involved in a grand jury investigation in October of 2001). Since Brenkus neither requested a limiting instruction at trial nor timely and properly objected in any way to the admission of Marjan's statement, he has waived any argument on this issue absent a showing of plain error. *See United States v. Martinez*, 939 F.2d 412, 414 (1991). Plain error exists only when there has been (1) an error, (2) that is plain, and (3) that affects substantial rights. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997). "If all three conditions are met, [this court] may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (citations and quotations omitted).

It is well-settled that statements that are offered for context, and not for the truth of the matter asserted, are not hearsay as defined in Rule 801 of the Federal Rules of Evidence. *See United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002). Marjan's statement to Brenkus that "Covelli was involved in the grand jury and . . . you know, he's the second person this month" was offered to provide the context for Brenkus's instructions to Marjan that he should lie to law enforcement. *See Gajo*, 290 F.3d at 930. Without Marjan's statement, Brenkus's response— "you don't know nothing," and "just play stupid"—would not have made any sense. Moreover, we have previously held that "[t]he failure of the trial court to give limiting instructions on the use of hearsay statements at the time of their admission does not

constitute plain error mandating reversal." *U.S. v. Fleming*, 594 F.2d 598, 606 (7th Cir. 1979). We find nothing in this record to cause us to depart from this rationale and thus we conclude that the district court did not err when it failed *sua sponte* to provide limiting instructions.

Moreover, even if we were to assume *arguendo* that the district court's failure to give limiting instructions was in error, the error still would not have affected Brenkus's substantial rights. As previously discussed, there is more than sufficient evidence in the record, apart from Marjan's statement, to support the jury's conclusion that a grand jury investigation was underway at the time Brenkus made his incriminating statements to Marjan. Accordingly, we reject Brenkus's contention that the district court committed plain error when it failed to provide a limiting instruction.

### B. Defendant Macari

On February 9, 2004, Macari pled guilty to one count of conspiracy to travel interstate to promote arson in violation of 18 U.S.C. § 371 (Count 2) and one count of aiding and abetting travel in interstate commerce to promote arson in violation of 18 U.S.C. § 1952(a)(3) (Count 13). On April 23, 2004, the district court sentenced Macari to a prison term of thirty-six months on Count 2, to be served concurrently with his ten-year Illinois state prison sentence for the attempted murder of Leyland, and a term of ten months on Count 13, to be served consecutive to the state sentence. Macari challenges his ten-month consecutive sentence, arguing that the district court abused its discretion by failing to make clear the rationale under which it imposed the consecutive sentence, and thus that portion of his sentence should be reversed.

Since Macari failed to raise a *Booker* issue before the district court, our review is for plain error only. *See United*

*States v. Paladino,* 401 F.3d 471, 481 (7th Cir. 2005). As this court has held in numerous cases, the pre-*Booker* mandatory application of the Sentencing Guidelines *ipso facto* constitutes plain error. *See United States v. White,* 406 F.3d 827, 835 (7th Cir. 2005); *United States v. Castillo,* 406 F.3d 806, 823-24 (7th Cir. 2005). On this record, we cannot ascertain or say with any exacting degree of certainty whether the sentencing judge would have imposed the same term of incarceration for Macari had she known that the Sentencing Guidelines were not mandatory at the time. Accordingly, we order a limited remand in this case, while retaining jurisdiction, for proceedings consistent with this court's decision in *Paladino.* 401 F.3d at 483-84.

## III.  Conclusion

We AFFIRM Brenkus's conviction and sentence but order a LIMITED REMAND of Macari's sentence in accordance with the procedures set forth in *Paladino.*

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*