276 Neb. 661
STATE OF NEBRASKA, APPELLEE,
v.
STEVEN PARKER, APPELLANT.
No. S-06-1442.
Court of Appeals of Nebraska.
Filed October 24, 2008.
Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.
MCCORMACK, J.

NATURE OF CASE
The defendant, Steven Parker, was found guilty of first degree sexual assault[1] and was sentenced to 10 to 16 years' imprisonment. During the testimony of the alleged victim, S.M., the court placed a large screen in the courtroom to block Parker and S.M. from seeing one another. We conclude that the screen unduly compromised the presumption of innocence fundamental to the right to a fair trial. The presence of the screen in the courtroom, in an obvious and peculiar departure from common practice, could have suggested to the jury that the court believed S.M. and endorsed her credibility, in violation of Parker's right to a fair trial. Because other means were available that would have protected S.M. without depriving Parker of his right to a fair trial, the screen was not justifiable. Because we cannot discount the effect the screen had on the jury's verdict, we reverse Parker's conviction.

BACKGROUND
Parker was charged with first degree assault of S.M. in relation to an incident occurring in June 2003. Prior to trial, the State requested that the court allow S.M. to testify in chambers rather than in the courtroom. Nebraska law[2] provides that, upon a showing of compelling need, in lieu of normal courtroom testimony, the court may allow videotaped pretrial deposition testimony, in camera closed circuit testimony, or any other accommodation of a child victim or child witness to a felony.
A pretrial hearing was conducted to determine whether there was such a compelling need in this case. Testimony was admitted at the hearing describing S.M.'s fear of Parker and her past psychological difficulties based on that fear, including posttraumatic stress disorder. S.M.'s treating psychologist, a specialist in child abuse, stated her concern that if S.M. were to be placed face-to-face with Parker at trial, she would reexperience the trauma of the abuse and suffer a debilitating relapse of posttraumatic stress.
The court found that some accommodation was necessary to protect S.M. from the psychological trauma that could result from a face-to-face confrontation with Parker. The trial court did not, however, grant the prosecution's request for in camera testimony. Instead, it found that "a less substantial digression from normal trial procedure is possible to safeguard the child's interest short of the procedure requested." The procedure the court decided upon involved the use of a screen in the courtroom during S.M.'s testimony that would block her view of Parker.
The courtroom in which Parker was tried is small. From the point of view of the parties, the defense table is on the right, and the prosecution table is on the left. The witness box is located on the right side of the room, in front of and slightly to the right of the defense table. The jury box is on the opposite side of the courtroom, and the witness box is oriented diagonally so that a witness is seated close to the wall, facing the bench and jury box, and facing away from the defense table.
As a result of this configuration, it was possible to place a screen perpendicular to the right wall of the courtroom, and extend the screen into the courtroom between the defense table and the witness box. The screen appears, from the photographs in the record, to have been a panel of the kind commonly used as an office partition. When the edge of the panel was against the right wall, the panel would stop just a few feet short of the edge of the defense table.
Because of the way the witness box was angled away from the defense table, it was apparently the trial court's original intent to keep the panel in this position, with the edge touching the wall, during the entire trial. In this way, the screen would never have been placed directly in front of Parker and, arguably, the jury would not have been aware that because of the angle of the witness box, Parker was shielded from S.M.'s view. It was apparently discovered that the panel in this position would not be far enough over to sufficiently block S.M.'s view of Parker, and a new plan was devised that involved moving the panel before S.M.'s testimony.
After having the edge of the screen touching the wall during other witnesses' testimony, the judge dismissed the jury on break while S.M. entered the witness box. As S.M. walked into the room, Parker was seated with the panel and an additional blackboard fully blocking any view of him. Once S.M. had sat down, the blackboard was removed. However, the panel remained behindnow located several feet into the courtroom and no longer sitting with one edge against the wall. The parties stayed seated as the jury reentered. The jurors could clearly observe that the panel was now situated so it completely covered the right half of the defense table where Parker was sitting. It was equally clear from the jury's vantage point that this panel was blocking S.M.'s view of Parker and Parker's view of her.
S.M. testified about the details of the abuse that occurred one night when Parker was visiting her home. S.M. also explained in detail how, after the incident, she became extremely afraid of Parker. For this reason, and also because she felt ashamed, S.M. explained that she did not tell anyone about the incident for a long time.
S.M. testified without objection that eventually, during the following school year, she told her best friend, Kellie P., about how Parker had touched her. S.M. described how, in June 2005, Kellie finally convinced S.M. to tell S.M.'s mother what had happened. S.M. said that after she told her parents, she felt very relieved that her parents were not mad at her.
At the same time, S.M.'s fear of Parker was heightened by the prospect that her parents would confront Parker and that he might retaliate against her or her family. S.M. testified that at one point after learning that she would likely be forced to see Parker in court, "I didn't want to see him so I just  I just told [my mother] that it never happened." The next day, however, S.M. explained to her mother that she had recanted only "so I wouldn't have to see him in court." Before S.M. testified, S.M.'s parents and her treating psychologist testified about the trauma S.M. had suffered and how fearful she was of Parker. S.M.'s parents specifically recounted for the jury how afraid S.M. would become whenever she was forced to contemplate facing Parker at trial.
Following S.M.'s testimony, the screen was moved back to its original position with one edge touching the wall. The jury found Parker guilty of the charge filed, and Parker appeals the conviction.

ASSIGNMENTS OF ERROR
Parker asserts, restated, that (1) the trial court's actions in erecting a screen between S.M. and Parker were unauthorized by § 29-1926; (2) § 29-1926 is unconstitutionally vague and overbroad on its face; (3) the screen violated Parker's rights under the Confrontation Clause; (4) the screen violated Parker's rights to a fair trial under the Due Process Clause; (5) the trial court erred in admitting Kellie's hearsay testimony; (6) the trial court erred in failing to grant a motion for mistrial for prosecutorial misconduct during closing arguments; and (7) trial counsel, who is different from appellate counsel, was ineffective for failing to make a timely motion for mistrial based on prosecutorial misconduct during closing arguments.

STANDARD OF REVIEW
[1,2] The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[3] On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[4]
[3-5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[5] When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of such evidence is a question of law, subject to de novo review.[6] A trial judge does not have discretion to admit inadmissible hearsay statements.[7] Therefore, apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.[8]

ANALYSIS

COURTROOM SCREEN AND RIGHT TO FAIR TRIAL
[6,7] The first issue we address, because we find it to be dispositive, is whether the use of a courtroom screen violated Parker's due process right to a fair trial. The right to a fair trial is a fundamental liberty secured by the 14th Amendment.[9] "`Whatever the status of a defendant in a criminal case may be and whatever be the nature of the crime with which he is charged, each and all are entitled to the same fair trial guaranteed by our Constitution.'"[10]
[8,9] One of the essential safeguards of a fair trial is the benefit of the presumption of innocence.[11] The presumption of innocence "is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."[12]
[10,11] Under this presumption of innocence, guilt is to be established by the State solely through the probative evidence introduced at trial.[13] Guilt shall not be founded on "'official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'"[14] A fair trial implies a trial "with sympathy for one party or hostility toward the other being kept at a minimum at all stages"[15] so that the "verdict rendered is based on a dispassionate consideration of the evidence."[16]
[12] The U.S. Supreme Court has mandated that courts "carefully guard against dilution"[17] of these principles of a fair trial and stay "alert to factors that may undermine the fairness of the fact-finding process."[18] While the Court has acknowledged the difficulty in determining the actual impact of a particular trial procedure on the judgment of the jury, it has explained that where "reason, principle, and common human experience"[19] indicate a "probability of deleterious effects on fundamental rights," then the procedure "calls for close judicial scrutiny."[20]
[13] The U.S. Supreme Court has considered certain procedures, such as compelling the defendant to attend trial in visible shackles, gagged, or in recognizable prison clothing, and determined them to be "inherently prejudicial" to the defendant's right to a fair trial and, thus, subject to close scrutiny.[21] In these cases, the scene presented to the jurors simply posed an unacceptable threat of "'impermissible factors coming into play" in the jury's determination of guilt.[22]
[14,15]] If a practice is inherently prejudicial, it can only pass close scrutiny if justified by an essential state interest specific to that trial.[23] If the practice is not justified by an essential state interest, then the defendant need not demonstrate actual prejudice in order to make out a due process violation warranting a reversal of his or her conviction.[24] Instead, in such circumstances, it is the State that must prove beyond a reasonable doubt that the error did not contribute to the verdict.[25]
In Deck v. Missouri,[26] the U.S. Supreme Court reasoned that it was inherently prejudicial to force the defendant to appear before the jury in visible shackles, because the shackles "suggest[ed] to the jury that the justice system itself s[aw] a `need to separate a defendant from the community at large.'" The Court further explained how the shackles were marks of public shame and disgrace. And the Court concluded that the use of shackles "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community."[27] It could not discount the improper influence that this implication could have on the jury's verdict.
In Illinois v. Allen,[28] the Court similarly explained:
Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.
In Estelle v. Williams,[29] the Court likewise reasoned that when the defendant is forced to wear identifiable prison clothing in front of the jury, there was an inherent risk from this "constant reminder of the accused's condition."
[16] The U.S. Supreme Court has said that not every practice tending to single out the accused from everyone else in the courtroom must be struck down.[30] "[J]urors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance."[31] Thus, the Court has "never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct."[32]
In Holbrook v. Flynn,[33] the Court accordingly held that extra security employed during trial was not inherently prejudicial to the defendant's presumption of innocence. The trial court had seated four uniformed state troopers in the front row of the joint trial of six defendants. There were eight other law enforcement officers throughout the courtroom. With the caveat that in a different case, it did not wish to "minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial,"[34] the Court found that in this case, the practice was not "inherently prejudicial." Even if the jurors had known the use of troopers was not common practice, this would not have necessarily been interpreted "as a sign that [the defendants] were particularly dangerous or culpable."[35]
[17] Instead, the Court explained, the jurors could have "just as easily believe[d]" that the officers were there to guard against outside disruptions; ensure peaceable resolution of any tense courtroom exchanges; or think nothing at all, given the presence of armed guards in most public places.[36] Unlike other practices struck down as inherently prejudicial, the troopers in this case did not brand the defendant with an "unmistakable mark of guilt"[37] or with "unmistakable indications of the need to separate a defendant from the community at large."[38] The Court summarized: "The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' " presence."[39]
We are unaware of a case in which any court has directly addressed the impact of a courtroom screening device upon the defendant's right to a fair trial. This appears to be largely due to the fact that, in contrast to the use of closed-circuit or videotaped testimony, screens are rarely used as an accommodation of child witnesses. Nevertheless, we find the case of Romero v. State,[40] a case where a witness was allowed to wear a noticeable disguise, to be illustrative of the inherent prejudice resulting from the jury's awareness of an officially sanctioned protection from the defendant.
In Romero, the State's witness was allowed to testify wearing the "disguise" of dark sunglasses, a baseball cap pulled low over his eyes, and a jacket with an upturned collar. Only the witness' ears, the tops of his cheeks, and the bridge of his nose were visible. The witness had refused to testify without this disguise because, while not the victim, he was generally fearful of the defendant's capacity for retribution.
On appeal, the court reversed the defendant's conviction because of the prejudicial nature of allowing such a disguise. The court explained that it improperly communicated to the jury that the defendant was dangerous or culpable. In addition, the disguise added "an unnecessary element of drama [and] placed unwarranted emphasis on [the defendant's] testimony."[41] While the court confessed it would be impossible to determine the weight individual jurors may have attributed to the disguise, it concluded that the practice posed an unacceptable threat to the defendant's right to a fair tria1.[42]
In this case, the threat to Parker's right to a fair trial was even more apparent than the practice found impermissible in Romero. From the beginning of the trial, as witnesses described in great detail how fearful S.M. was of facing Parker, a large opaque screen jutted curiously into the room with one edge touching the wall and the other edge approaching the corner of Parker's table. Then, the jury was dismissed, and when it came back, it found that S.M. was sitting in the witness box and the screen had been moved to stand squarely between her and Parker.
The screen remained a constant presence during S.M.'s testimony. The screen stood there protecting S.M. as she told the jury how fearful she was of Parker. The screen was, in effect, a judicially sanctioned prop that lent credence to the witness' claims. Not until S.M. left the courtroom was the screen replaced to its original awkward position against the wall.
While the court surely placed the screen in the room out of genuine concern for S.M., that concern is precisely the threat to Parker's right to a fair trial. Whether S.M. really had reason to fear Parker, because he had abused her, was the essential subject that the jury had to determinebased solely on the evidence properly adduced at trial. The insertion of the screen into the courtroom created a risk that this did not occur. It would have been a matter of common sense for the jurors to conclude that the court had placed the screen for S.M.'s protection because the court believed her accusations were true. We find it hard to imagine a practice more damaging to the presumption of innocence than one from which the jury may infer the court's official sanction of the truth of the accuser's testimony.
And even discounting such an explicit connection, there were no other innocuous inferences the jury would have been likely to derive from the screen. This is unlike the extra security that the jurors in Holbrook could have thought was due merely to the number of defendants or outside disturbances or that they could have barely noticed because of the common presence of security in similar public places. Instead, more akin to prison garb or shackles, the screen acted as a dramatic reminder of Parker's position as the accused at trial. The scene presented of the jurors watching Parker as he was forced to look onto a large panel instead of his accuser makes palpable the marks of shame and guilt caused by this looming presence in the courtroom. Nor can we ignore, like Romero, the dramatic emphasis placed by the screen upon the State's key witness. In a case such as this, where the jury's assessment of the credibility of the accuser is so crucial, the risk of these impermissible factors simply cannot be overlooked. We conclude that the screen was inherently prejudicial to Parker's right to a fair trial.
[18] Having determined that the screen was inherently prejudicial, we subject the procedure to close judicial scrutiny and consider whether it was justified by an essential state interest specific to this trial.[43] We agree with the State's contention that the protection of children from physical as well as psychological harm is a compelling state interest.[44] In this case, there was testimony that S.M. could suffer serious psychological harm if forced to view Parker face-to-face. In addition, there was evidence that S.M. would be unable to testify completely and accurately under such duress, and this implicated the State's essential interest in the fairness and accuracy of the trial process.[45]
Nevertheless, we conclude that the inherently prejudicial practice in this case cannot pass close scrutiny, because the court had available another equally effective method of protecting S.M. while procuring her testimony that would not have been inherently prejudicial to Parker's due process rights. Section 29-1926 specifically provides for various means of obtaining the victim's testimony through pretrial videotaping or closed circuit video from another room. It does not, actually, make any reference to using a screen in the courtroom. The U.S. Supreme Court, while not addressing the Due Process Clause, has specifically sanctioned the use of one-way closed circuit television as a justified infringement upon the defendant's confrontation rights when a specific showing of necessity is made.[46] And at least one state court has addressed the television procedure in a challenge based upon the defendant's right to a fair trial, finding it acceptable.
In Marx v. State,[47] the court held that a closed-circuit in camera procedure was not inherently prejudicial to the defendant's right to a fair trial. The trial court, after considering specific evidence and finding that the victim and another child witness would be traumatized by being required to testify in the defendant's presence, had allowed the children to testify from another room through two-way closed circuit television. The jury was instructed by the court that such procedure was authorized by statute "'in these types of cases."[48]
On appeal, the court in Marx rejected the defendant's contention that the use of closed circuit television impaired his presumption of innocence. The court explained that the instruction likely conveyed to the jury the state's general desire to protect children from the intimidating courtroom environment rather than from the defendant specifically. Even in the absence of the instruction, the court opined that the closed circuit procedure would probably be viewed by the jury as suggesting that the witness was "'fearful of testifying in the courtroom setting rather than fearful of testifying while looking at the defendant.'"[49] As such, the court concluded that it was unlikely the procedure would have an impermissible subconscious effect on the jury's attitude toward the defendant.
We agree that in videotaped or closed-circuit television procedures, the jury would not usually be specifically aware that the child was being shielded from the defendant. Instead, the jury could easily infer that the accommodation was standard procedure for children who, as common sense dictates, may be intimidated by the courtroom environment. The trial court in this case indicated that it preferred that the jury see S.M.'s testimony in person rather than through a television screen. While this is generally preferable, the court lost sight of the effect the screen would have on the presumption of Parker's innocence. The State has made no attempt to prove that this inherently prejudicial practice did not actually attribute to the jury's verdict, and so we are obliged to reverse and remand for a new trial.

HEARSAY OBJECTION
[19] Having determined that a new trial is warranted by the screen's prejudice to Parker's due process rights, we need not address his remaining assignments of error. However, an appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[50] We find that such an issue exists with respect to Kellie's alleged hearsay testimony.
As previously noted, S.M. testified that she had confided in her best friend, Kellie, about the alleged sexual assault. Kellie testified as the last witness for the State's case in chief. When the prosecution began to ask Kellie about the conversation she had with S.M., Parker's counsel objected on the grounds of hearsay. The prosecution responded that it was not offering S.M.'s statement for the truth of the matter asserted, but "simply to show that a promise was made; consequently, that  the effect on what that had on Kellie." The court allowed the testimony to continue, and Kellie testified that S.M. had told her that Parker "molested her or she said touched her in her private parts." The court then immediately instructed the jury:
I will allow you to hear that evidence only for the purpose of  that that was what was said, not for the truth of the statement. So you can consider that statement only for the purpose that that is what [S.M.] told Kellie but not for the purposes of whether that statement is true or not.
Kellie continued to testify that S.M. had made her "pinky swear" not to tell anyone about it, and so she did not. Kellie also testified about how she eventually convinced S.M. to report the abuse to S.M.'s mother.
[20,21] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[51] If an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay.[52] But a statement or assertion offered to prove the truth of the matter asserted is a hearsay statement under Neb. Evid. R. 801(3)[53] unless it falls within an exception or exclusion under the hearsay rules.[54]
We agree with Parker that the State's explanation that the statement was relevant to show that "a promise was made" was insufficient to overcome Parker's hearsay objection. Neither the prosecution nor the trial court clearly explained how the fact that the statement was made was relevant to an issue in the case. In particular, it was not explained how the effect of the statement on Kellie was relevant to an issue in the case. And the State did not argue below or on appeal that any statutory exception to the hearsay rule, such as responding to a charge of recent fabrication, was applicable. Therefore, on the record and legal theory presently before us, the trial court erred in admitting the statement.[55]

CONCLUSION
It is our duty to uphold that "axiomatic and elementary"[56] aspect of the due process right to a fair trialthe presumption of innocence. We would be derelict in that duty if we ignored the significance of a large screen intruding into the courtroom, obviously intended to shield Parker from S.M. as she testifies how the alleged crime has caused her to fear him. We cannot conclude that the jury's determination of the credibility of S.M. was not influenced by the resulting drama, indignity, and implicit endorsement of S.M.'s testimony.
[22,23] Although the Double Jeopardy Clauses of the federal and state Constitutions do not protect against a second prosecution for the same offense where a conviction is reversed for trial error, they bar retrial if the reversal is necessitated because the evidence was legally insufficient to sustain the conviction.[57] The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.[58] Parker does not argue that principles of double jeopardy would be offended by retrying him, and our review of the record does not suggest that the evidence was legally insufficient. Therefore, Parker's conviction is reversed and the cause is remanded for a new trial in accordance with this opinion.
REVERSED AND REMANDED FOR A NEW TRIAL.
GERRARD, J., concurring.
I fully join the court's opinion. I agree that the presence of a barrier in the courtroom, placed in front of the witness box during the testimony of a single witness, compromised Parker's right to a fair trial. I write briefly to comment on the issue presented by Kellie's testimony about S.M.'s hearsay statement.
I agree that the record in this case does not support the trial court's decision to permit the disputed testimony. Neither the State's argument at trial nor the trial court's reasoning when allowing the testimony was sufficient to explain why the testimony was relevant for a purpose other than the truth of the matter asserted.
But I want to emphasize that our conclusion on this record does not preclude the possibility that similar testimony may be relevant and admissible for a nonhearsay purpose. Statements that are relevant because of their impact on the hearer are not hearsay.[1] This may include statements relevant to explain the course of a series of events or to otherwise provide context to the evidence presented.[2]
But admitting evidence on such a basis requires a clear understanding of why the evidence was relevant for a nonhearsay purpose. In other words, context is everything. And in this case, neither the State nor the trial court persuasively explained how the effect of S.M.'s hearsay statement on Kellie was relevant. Appellate evaluation of this sort of issue is difficult when the independent relevance of the evidence is not clearly articulated on the record.[3] Therefore, I agree that the explanations proffered in this case were insufficient to justify admission of the disputed evidence, and I join the court's opinion.
HEAVICAN, C.J., joins in this concurrence.
NOTES
[1] See Neb. Rev. Stat. § 28-319(1)(c) (Reissue 1995).
[2] Neb. Rev. Stat. § 29-1926 (Cum. Supp. 2004).
[3] Newman v. Rehr, 263 Neb. 111, 638 N.W.2d 863 (2002).
[4] Id.
[5] State v. Draganescu, ante p. 448, 755 N.W.2d 57 (2008).
[6] Id.
[7] Id.
[8] Id.
[9] Estelle v. Williams, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976).
[10] Wamsley v. State, 171 Neb. 197, 211, 106 N.W.2d 22, 30 (1960).
[11] Estelle v. Williams, supra note 9.
[12] Coffin v. United States, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895).
[13] Id.
[14] Holbrook v. Flynn, 475 U.S. 560, 567, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). See, also, State v. Weikle, 223 Neb. 81, 388 N.W.2d 110 (1986).
[15] Wamsley v. State, supra note 10, 171 Neb. at 210, 106 N.W.2d at 30.
[16] Id. at 208, 106 N.W.2d at 29.
[17] Estelle v. Williams, supra note 9, 425 U.S. at 503.
[18] Id.
[19] Id., 425 U.S. at 504.
[20] Id.
[21] See, Deck v. Missouri, 544 U.S. 622, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005); Holbrook v. Flynn, supra note 14; Estelle v. Williams, supra note 9; Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Compare, State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003); State v. Sorich, 226 Neb. 547, 412 N.W.2d 484 (1987). See, also, State v. Daniels, 40 P.3d 611 (Utah 2002).
[22] Holbrook v. Flynn, supra note 14, 475 U.S. at 570. Accord Estelle v. Williams, supra note 9.
[23] Holbrook v. Flynn, supra note 14.
[24] Deck v. Missouri, supra note 21.
[25] Id.
[26] Id., 544 U.S. at 630.
[27] Id., 544 U.S. at 633.
[28] Illinois v. Allen, supra note 21, 397 U.S. at 344.
[29] Estelle v. Williams, supra note 9, 425 U.S. at 504.
[30] Holbrook v. Flynn, supra note 14; State v. Mata, supra note 21.
[31] Holbrook v. Flynn, supra note 14, 475 U.S. at 567.
[32] Id.
[33] Id.
[34] Id., 475 U.S. at 570-71.
[35] Id., 475 U.S. at 569.
[36] Id.
[37] Estelle v. Williams, supra note 9, 425 U.S. at 518. See, also, Holbrook v. Flynn, supra note 14.
[38] Holbrook v. Flynn, supra note 14, 475 U.S. at 569.
[39] Id.
[40] Romero v. State, 136 S.W.3d 680 (Tex. App. 2004), affirmed 173 S.W.3d 502 (Tex. Crim. App. 2005).
[41] Id. at 690.
[42] Id.
[43] Holbrook v. Flynn, supra note 14.
[44] See, e.g., Maryland v. Craig, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).
[45] See, Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006); Deck v. Missouri, supra note 21.
[46] Maryland v. Craig, supra note 44.
[47] Marx v. State, 987 S.W.2d 577 (Tex. Crim. App. 1999).
[48] Id. at 580.
[49] Id. at 581, quoting Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 24.3 at 1015 (2d ed. 1992).
[50] Papillion Rural Fire Prot. Dist. v. City of Bellevue, 274 Neb. 214, 739 N.W.2d 162 (2007).
[51] State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006).
[52] State v. Morrow, 273 Neb. 592, 731 N.W.2d 558 (2007), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727.
[53] Neb. Rev. Stat. § 27-801(3) (Reissue 1995).
[54] State v. Draganescu, supra note 5.
[55] See, e.g., Plowman v. Pratt, 268 Neb. 466, 684 N.W.2d 28 (2004). See, also, U.S. v. Paulino, 445 F.3d 211 (2d Cir. 2006); U.S. v. Huguez-Ibarra, 954 F.2d 546 (9th Cir. 1992).
[56] See Coffin v. United States, supra note 12, 156 U.S. at 453.
[57] State v. Floyd, 272 Neb. 898, 725 N.W.2d 817 (2007), disapproved on other grounds, State v. McCulloch, supra note 52.
[58] State v. McCulloch, supra note 52.
[1] See, e.g., State v. Bear Runner, 198 Neb. 368, 252 N.W.2d 638 (1977). See, generally, R. Collin Mangrum, Mangrum on Nebraska Evidence 638 (2008).
[2] See, e.g., U.S. v. Eberhart, 467 F.3d 659 (7th Cir. 2006); U.S. v. Macari, 453 F.3d 926 (7th Cir. 2006); United States v. Bright, 630 F.2d 804 (5th Cir. 1980); United States v. Gonzales, 606 F.2d 70 (5th Cir. 1979); Burgess v. U.S., 786 A.2d 561 (D.C. 2001); Bear Runner, supra note 1.
[3] Cf. State v. Sanchez, 257 Neb. 291, 597 N.W.2d 361 (1999).