In re Interest of Chloe P., a child
under 18 years of age.
State of Nebraska, appellee, v. Susan M.,
appellant, and Joseph P., appellee.

___ N.W.2d ___

Filed November 5, 2013.    No. A-12-827.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretations or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.
3. **Constitutional Law: Due Process.** The determination of whether the procedures afforded an individual comport with due process is a question of law.
4. **Juvenile Courts: Parental Rights: Final Orders.** An ex parte temporary custody order keeping a child's custody from his or her parent for a short period of time is not a final order.
5. **Juvenile Courts: Final Orders: Appeal and Error.** Unlike an ex parte temporary order, a detention order entered after a detention hearing is a final, appealable order.
6. **Juvenile Courts: Jurisdiction: Proof.** The juvenile court shall have jurisdiction over a juvenile if the State proves that the juvenile is within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) by a preponderance of the evidence.
7. **Juvenile Courts: Proof.** While the State need not prove that the juvenile has suffered physical harm to find the juvenile to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008), the State must establish that without intervention, there is a definite risk of future harm.
8. ____: ____. In order to establish a definite risk of future harm, there must be an evidentiary nexus between the allegations of the petition and a definite risk of future harm.
9. **Rules of the Supreme Court: Appeal and Error.** Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.
10. ____: ____. Neb. Ct. R. App. P. § 2-101(E) (rev. 2010) instructs an appellee on how to assert a cross-appeal. It states that the proper filing of an appeal shall vest in an appellee the right to a cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012).

Appeal from the County Court for Madison County: Ross A. Stoffer, Judge. Affirmed.

Chelsey R. Hartner, Deputy Madison County Public Defender, for appellant.

Gail Collins, Deputy Madison County Attorney, for appellee State of Nebraska.

Patrick P. Carney, of Carney Law, P.C., for appellee Joseph P.

R.D. Stafford, of Brogan & Stafford, P.C., guardian ad litem.

Inbody, Chief Judge, and Irwin and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Chloe P. was removed from the care and custody of her biological parents, Susan M. and Joseph P., and was later adjudicated as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). Susan appeals, and Joseph attempts to cross-appeal. We affirm Chloe's continued placement with the State and her adjudication, because we conclude that the State proved by clear and convincing evidence that a definite risk existed that Susan and Joseph would not provide for Chloe's medical needs. We also conclude that Joseph did not properly cross-appeal; therefore, we grant him no affirmative relief and consider his arguments only to the extent that they address an error assigned by Susan.

## II. BACKGROUND

Chloe was born in January 2012 at a hospital in Norfolk. She soon developed electrolyte disturbances, hypoglycemia, and feeding issues. Her feeding issues were significant enough that she required the assistance of a nasogastric feeding tube to complete her feedings. Her overall medical condition required her temporary transfer to a neonatal intensive care unit at a children's hospital in Omaha. Chloe was hospitalized for 20 days before being discharged.

Chloe's doctor, Erin Pierce, placed her on a strict feeding schedule because she was at risk for failure to thrive. Dr. Pierce ordered a 48-hour monitoring period of Chloe prior

to her discharge to verify that Susan and Joseph were able to meet Chloe's needs. During this time, Susan and Joseph were to have total responsibility for taking care of Chloe. On two occasions during the 48-hour monitoring period, Chloe's nurse, Amanda Holcomb, had to wake Susan to complete Chloe's feedings. Holcomb did not chart these prompts, but reported them to a Department of Health and Human Services (DHHS) child protection worker, Traci Fox. Unaware of the prompts, Dr. Pierce determined Susan successfully completed the 48-hour monitoring period and discharged Chloe to her care on January 30, 2012.

On the day of discharge, the State filed a juvenile petition and motion for temporary care and custody of Chloe. In its petition, the State alleged that Chloe had feeding problems and that her parents lacked the skills to provide for her safety and well-being. The State further alleged, among other things, that the parents had been convicted in 2008 and 2009 for abuse to siblings of Chloe and that they subsequently relinquished their parental rights to those children. In her affidavit in support of the motion for temporary custody, the prosecutor erroneously alleged that Chloe had to be "life-flighted" to the children's hospital and that her feeding tube was not removed until January 29, 2012. In reality, Chloe was transported to the children's hospital by vehicle and her feeding tube was removed on January 27.

The county court issued an ex parte order authorizing DHHS to obtain temporary custody of Chloe and scheduled a placement hearing for February 21, 2012. As a result, DHHS removed Chloe from Susan's and Joseph's custody on January 30.

All parties appeared on February 21, 2012, at what appears to have been a combined placement hearing and first hearing on the State's adjudication petition. Susan and Joseph confirmed that they understood the State's allegations and the potential ramifications if those allegations were proved. Each parent denied the allegations. The State then requested that Chloe temporarily remain in the custody of DHHS. Neither Joseph nor the guardian ad litem had any objection to that placement. Susan, however, requested that the child be placed

with her. Following that request, Susan's counsel stated, "I'm not going to offer any evidence to support that." The county court took judicial notice of the State's affidavit that had been filed in support of its initial motion for temporary custody. Based on that evidence, the court found that reasonable efforts had been made to prevent or eliminate the need for removal and that Chloe required out-of-home placement.

Susan subsequently filed a motion, and then an amended motion, seeking the return of legal and physical custody of Chloe. The court determined that the adjudication and motion for return of legal and physical custody would be heard at the same time due to scheduling and the commonality of the issues.

In May and June 2012, the county court received evidence on the State's adjudication petition and Susan's motion for return of legal and physical custody. Susan stated a continuing objection to the court's refusal to hear her motion prior to receiving evidence on the State's petition. The county court overruled the objection, noting that if the evidence supported Susan's motion for the return of legal and physical custody of Chloe, the same evidence would support a denial of adjudicating Chloe.

## III. TRIAL TESTIMONY

### 1. Background Testimony

As a backdrop for the current adjudication petition, the State adduced a substantial amount of evidence concerning Susan's and Joseph's parenting history. Much of the testimony addressed the State's involvement with Susan and her two older children, beginning in September 2009 when they were living in a tent. At that time, the children were approximately 3 years old and 6 months old. Both children were removed from Susan's care the following month. A family support worker who was assigned to the case from October 2009 through March 2011 testified that during supervised visitation, she had numerous safety and supervision concerns for the children. The service coordinator for the case testified that during her involvement, Susan and Joseph displayed a continual inability to feed the children properly, giving the older child coffee and

caffeinated soft drinks, despite his attention deficit disorder, and giving the younger child dairy products, despite her lactose intolerance. She further testified that the relationship between Susan and Joseph was volatile, resulting in a charge of third degree assault against Joseph and the issuance of a protection order against him.

According to the caseworkers, the children were returned to Susan's care for a short period of time in November 2010, but a month later, the State filed a motion to terminate the parental rights of Susan and Joseph. They voluntarily relinquished their parental rights in April 2011.

By way of further background, Dr. Mark Hannappel testified, over objection, that he performed psychological evaluations of both Susan and Joseph in July 2010. He diagnosed Joseph with a mood disorder and mild mental retardation. Dr. Hannappel testified that he thought Joseph had limited ability to become an adequate parent. He stated that Joseph's ability to parent could change if he showed interest and the motivation to alter the habitual patterns in his thinking and behavior. However, Dr. Hannappel testified that he would have serious concerns for the safety of a child in Joseph's care if Joseph did not receive therapy.

Dr. Hannappel stated that Susan had adjustment disorder, anxiety, and dependent personality features. His impression was that Susan had limited potential to change, and he recommended intensive services until she demonstrated the potential to adequately care for her children. He opined that Susan did not appear receptive to help. Although he felt she had the capacity to learn, her personality features interfered with her ability to incorporate information into the structure of her life and her children's lives. Dr. Hannappel testified that if Susan had not increased her understanding of childhood development, that would show she did not have the motivation to change her circumstances and would indicate that children in her care were at risk.

## 2. Testimony as to Chloe

The trial testimony reveals that about 6 months after relinquishing her parental rights to her two older children, Susan

sought prenatal assistance from "WIC," a supplemental food program, during her pregnancy with Chloe. A nurse who had worked at the "WIC" office testified that she counseled Susan to stop smoking, because smoking would result in a low birth weight. Susan responded that she would continue to smoke so that she would not need to "push out" a larger baby. The nurse suggested Susan become involved in the program "Operation Great Start," which helps educate new parents and provide them with baby supplies. Susan declined, stating that although she did not have baby supplies at the time, if need be, "she would steal them."

Dr. Pierce testified that shortly after birth, Chloe displayed electrolyte disturbances, hypoglycemia, and feeding issues. To address the feeding issues, she placed Chloe on a feeding schedule in which Chloe was to consume 60 cubic centimeters of formula within 30 minutes, every 3 hours. The remaining formula was to be gavaged through the nasogastric tube.

Several nurses and social workers from the hospital in Norfolk testified to concerns they had, based upon Susan's and Joseph's actions and comments while Chloe was hospitalized. In addition to her statement that Susan needed to be prompted to feed Chloe during the 48-hour monitoring period, Holcomb testified that both parents had difficulty following Chloe's feeding schedule. Holcomb recalled that Susan dismissed Chloe's inability to complete feeding in 30 minutes by stating that Chloe was a "slow eater" and that she just needed some extra time. Holcomb also testified that Joseph needed substantial encouragement to complete Chloe's feedings and that he would frequently become distracted by cartoons on television.

Several other medical professionals testified that Susan made concerning remarks about Chloe's feeding schedule. Susan commented that Chloe liked to "snack" in the afternoon, which showed an ignorance to the importance of Chloe's receiving each feeding properly; Susan repeatedly said that she did not need to burp Chloe because of the type of formula she was using; and Susan disclosed that she would not use sterile water for Chloe's bottles at home.

Several nurses testified that Susan was not able to keep herself or the room clean. On one occasion, a cockroach was found in the hospital room. The cockroach was believed to have been brought in with Susan's belongings. Nurses also testified that Susan allowed registered sex offenders in Chloe's hospital room and that she expressed no concern in having Chloe exposed to them. One of these offenders had been living with Susan and Joseph prior to Chloe's birth and was found at their home on several occasions afterward.

The child protection worker, Fox, testified that prior to discharge, she met with both Susan and Joseph to discuss their prior parental rights relinquishments and their plans to care for Chloe. Fox testified that when she discussed Chloe's medical condition with Susan, Susan complained about several of the medical recommendations. In particular, Susan stated that the hospital's desire for Chloe to eat every 3 hours seemed unreasonable and that she thought the hospital was requiring Chloe to eat too much. This concerned Fox because she was afraid Susan would not follow the doctor's orders.

Although Fox believed an adjudication was proper, she testified that she was aware of alternate arrangements being planned in case Chloe stayed at home. Had that happened, Chloe would have received the services of a family support worker in the home twice per day, 5 days per week, and from a home health nurse twice a week. Fox testified that she had concerns about sending Chloe home, even with those services, because they were insufficient to ensure Chloe consistently received each feeding. Fox believed Susan would not follow the feeding schedule because she did not demonstrate that she understood its importance and failed to follow it in the hospital.

Fox testified that she removed Chloe from Susan's and Joseph's custody in January 2012. She stated that the night she removed Chloe, Susan and Joseph had only a partial can of formula remaining. They said that they would not have money to buy more formula until Joseph received his Social Security check the next day at midnight. Fox noted that the amount of remaining formula was insufficient to feed Chloe until that time.

At the close of the State's evidence, Susan again objected to the court's failure to hear her motion for return of legal and physical custody before receiving evidence on the State's petition for adjudication. The county court overruled her objection, stating it would treat her motion as a defense to the petition and would not hold a separate hearing on it.

In August 2012, the trial court issued an order finding Chloe to be a juvenile within the meaning of § 43-247(3)(a). The trial court determined that Chloe faced a risk of not receiving feedings that were necessary for her development. The court determined that this constituted a definite risk of future harm. The trial court further found that Susan's actions while learning to care for Chloe, combined with her history of inadequate parenting, proved by a preponderance of the evidence that Chloe was a juvenile within the meaning of § 43-247(3)(a).

This appeal followed.

## IV. ASSIGNMENTS OF ERROR

On appeal, Susan argues that the trial court erred in granting the State's motion for temporary custody, in failing to hear her motion for the return of legal and physical custody before the adjudication hearing, and in adjudicating Chloe as a juvenile within the meaning of § 43-247(3)(a). As noted above, Joseph's cross-appeal does not comport with the Nebraska court rules of appellate practice. Because Joseph's assigned error regarding the court's adjudication of Chloe under § 43-247(3)(a) overlaps with that of Susan's, we will consider his argument as support for Susan's assigned error, but disregard his remaining assignment of error.

## V. STANDARD OF REVIEW

[1-3] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Dustin S.*, 276 Neb. 635, 756 N.W.2d 277 (2008). To the extent an appeal calls for statutory interpretations or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *Id.* The determination of whether the procedures afforded an individual comport

with due process is a question of law. See *State v. Parker*, 276 Neb. 661, 757 N.W.2d 7 (2008).

## VI. ANALYSIS

### 1. Granting State's Motion for Temporary Custody of Chloe

[4] Susan argues that the trial court erred in granting temporary custody of Chloe to DHHS. She argues it was error to grant the ex parte order and to order continued placement with DHHS. We are without jurisdiction, however, to address any alleged error in the granting of the ex parte order. An ex parte temporary custody order keeping a child's custody from his or her parent for a short period of time is not a final order. See *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991). Because this court is without jurisdiction to consider orders which are not final in nature, we are without jurisdiction to consider Susan's argument that the court erred in granting the temporary ex parte custody order.

[5] Susan also argues that the court erred in granting the State's motion for continued custody of Chloe, because the court failed to conduct a contested detention hearing. Unlike an ex parte temporary order, a detention order entered after a detention hearing is a final, appealable order. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds*, *O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). Whether the February 21, 2012, hearing satisfied the due process requirements of a detention hearing is also reviewable. See *In re Interest of Borius H. et al.*, 251 Neb. 397, 558 N.W.2d 31 (1997). However, in order for us to review these matters, Susan was required to timely appeal from the February 21 order continuing placement of Chloe with DHHS. Since Susan did not file a notice of appeal until September 11, we are without jurisdiction to address errors relating to the February 21 hearing. See *In re Interest of Zachary L.*, 4 Neb. App. 324, 543 N.W.2d 211 (1996) (acknowledging we do not have jurisdiction to entertain appeal raising issues in juvenile case that settled substantial right

more than 30 days before appeal was perfected). Therefore, we do not address any issues raised regarding the temporary hearing of February 21.

## 2. Failing to Hear Susan's Motion for Return of Legal and Physical Custody Prior to Adjudication Hearing

Susan assigns as error the court's refusal to hear her motion for return of custody prior to the adjudication hearing. Susan filed her motion for return of custody on March 27, 2012, the day of the pretrial, and indicated that the hearing would take approximately half a day. The court's schedule, combined with that of counsel, could not accommodate Susan's request, and therefore the court set the hearing date for May 7—the same date as the hearing on the adjudication petition. Susan filed an amended motion for return of custody on April 18, and at an impromptu hearing on April 30, the court iterated that the hearing on Susan's motion and the State's petition would take place at the same time due to the commonality of witnesses and the court's time constraints. The hearing was ultimately commenced on May 7 and was carried over to additional days in May and June.

Although Susan argues that "[n]o other detention hearing was ever scheduled," brief for appellant at 19, the trial court did not deny Susan the opportunity to present evidence on her motion. Rather, the trial court simply required her to present the evidence at the same time evidence was presented for adjudication. The practicality of this decision is emphasized by the length of the adjudication hearing and the overlapping nature of the evidence supporting both the adjudication and the motion.

In this case, Susan had ample opportunity to present evidence to the trial court challenging Chloe's removal. Accordingly, she was not entitled to a separate hearing on her motion for the return of legal and physical custody after being afforded an opportunity to present evidence on the removal at the hearing in February.

### 3. Adjudicating Chloe as Juvenile Within
### Meaning of § 43-247(3)(a)

Susan argues that the trial court erred in finding Chloe to be a minor within the meaning of § 43-247(3)(a), and Joseph joins in this argument. In particular, they argue that the trial court failed to require the State to show a "definite risk of future harm," brief for appellant at 19, and to demonstrate the evidentiary nexus between its allegations and a definite risk of future harm. We disagree.

Section 43-247(3)(a) provides that the juvenile court shall have jurisdiction over any juvenile

> who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; . . . or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile[.]

[6-8] The juvenile court shall have jurisdiction over a juvenile if the State proves that the juvenile is within the meaning of § 43-247(3)(a) by a preponderance of the evidence. See *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). While the State need not prove that the juvenile has suffered physical harm to find the juvenile to be within the meaning of § 43-247(3)(a), the State must establish that "without intervention, there is a definite risk of future harm." *In re Interest of Anaya*, 276 Neb. 825, 838, 758 N.W.2d 10, 21 (2008). In order to establish a "definite risk of future harm," there must be an evidentiary nexus between the allegations of the petition and a definite risk of future harm. *In re Interest of Taeven Z.*, 19 Neb. App. 831, 839, 812 N.W.2d 313, 321 (2012).

### (a) Definite Risk of Future Harm

Susan and Joseph argue that the trial court did not properly find a *definite* risk of future harm to Chloe. Susan argues that in order to find a definite risk, the risk needed to be "'free of all ambiguity, uncertainty, or obscurity.'" Brief for appellant

at 20. Susan argues that the risk in this case did not meet this standard because it was uncertain whether or not Chloe would suffer harm.

While the juvenile court must find that the juvenile's situation presents a definite risk of future harm, a juvenile court is not required to "'"'"wait until disaster has befallen a minor child before the court may acquire jurisdiction. . . .'"'"'" *In re Interest of Gloria F.*, 254 Neb. 531, 537, 577 N.W.2d 296, 301 (1998) (quoting *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997)). Because the court is not required to wait for disaster, "identifying specific evidence of harm or risk of harm is unnecessary." *In re Interest of Gloria F., supra*.

The trial court defined "risk" as the "'possibility of loss or injury.'" To have a definite risk, the possibility of loss or injury must be free from ambiguity.

After carefully laying out the requirement that Chloe be at a "'definite risk of future harm,'" the county court stated:

> Here the risk that Chloe faced on January 30, 2012 was that she would not receive the proper feedings that the medical experts had stated she required to properly grow and would not be properly cared for in the ways appropriate for an infant. In evaluating the probability of such risks occurring the Court looked at the evidence of the failed "48 hour room-in"; the improper mixing of formula by the mother; the attitude of the mother demonstrated by the statement that infants "sleep when they want and eat when they want" in the face of the medical expert's requirement of a definite schedule of feedings and amount and manner of those feedings; the not having sufficient formula for Chloe on January 30, 2012 when DHHS came to remove Chloe; the refusal to seek or accept assistance from offered programs; the inability of the parents to grasp the importance and manner of the feedings despite repeated training; [and] the psychological testimony of the parents' habitual patterns of inadequate parenting, their inability to change and failure to recognize their need to change . . . .

The evidence provided to the court showed that there was a *definite* risk that Chloe would not receive the feedings or care that she needed. Susan claims that the State demonstrated only the "possibility" of risk, not a "definite risk." Brief for appellant at 21. As evidenced by the above, however, the trial court found that given all the circumstances, a "definite risk" existed. We agree.

### (b) Failure to Demonstrate Evidentiary Nexus Between Allegations and Definite Risk of Future Harm

Susan and Joseph argue that the State failed to demonstrate an evidentiary nexus between its allegations and a definite risk of future harm. In particular, they note that Chloe did not have any specialized feeding needs at the time of her discharge and that the hospital and the State had arranged sufficient services to intervene before Chloe suffered actual harm. We disagree.

At the outset, we note that the State does not have to wait until a child suffers harm before intervening. See *In re Interest of Gloria F., supra*. In this case, there is a nexus between the evidence presented at the trial, the State's allegations, and harm to Chloe. Although many of Chloe's medical problems had resolved at the time of her discharge, she was still at risk for failure to thrive. The fact that she no longer required a feeding tube and that her electrolytes were stabilized did not diminish the importance of her prescribed feeding schedule. Dr. Pierce testified that maintaining this schedule was critically important.

The medical concern over Chloe's feeding schedule is evident from the fact that the hospital took the unusual step of conducting a 48-hour monitoring period to ensure Chloe's parents could properly care for her prior to her discharge. Dr. Pierce testified that if she had known Susan had to be prompted to feed Chloe during the 48 hours, she would have considered the 48-hour period a failure, and that the information regarding prompting would have affected her decision to discharge Chloe. Although the prompting was not documented in the nursing notes, Chloe's nurse, Holcomb, testified that it

occurred; that she reported it to the child protection worker, Fox, the next day; and that Fox included it in her letter to the court. There was no evidence presented disputing the prompts. Several health care providers testified that Susan's comments about the feeding schedule caused them concern about Chloe's well-being in Susan's care.

The evidence showed that Susan could not care for Chloe even in an optimal, supportive environment, where she knew she was being monitored. Given her failure to care for Chloe in that environment, it is unlikely she would be able to care for Chloe outside of that environment. Indeed, the evidence presented at trial showed that Susan has significant stressors, including financial and relationship stressors, that would inhibit her ability to care for Chloe.

The record revealed that the substantial support put in place by the State would not be enough to ensure that Chloe received all eight of the feedings that she needed each day. Although Dr. Pierce testified that medical intervention would be possible before Chloe failed to thrive, the record reveals that these circumstances created a definite risk that Chloe would not receive the feedings medically required. The risk that Chloe would not receive the feedings medically required is a definite risk of harm. It is not necessary that Chloe actually fail to thrive before becoming a juvenile within the meaning of § 43-247(3)(a).

Susan and Joseph also argue that none of the evidence presented about the voluntary relinquishment of her two other children showed a definite risk of future harm to Chloe. While the evidence presented about the prior relinquishments did not, on its own, show that Chloe was at risk of future harm, the evidence did provide the trial court with some insight into how Susan and Joseph dealt with stressors previously, which provided the court with some evidence of their parenting habits. The evidence of Susan's and Joseph's past struggles combined with the evidence about their reaction to Chloe's medical situation showed that there was a definite risk Chloe would suffer harm in the future in Susan's and Joseph's care.

### 4. Joseph's Cross-Appeal

Before addressing the deficiencies in Joseph's cross-appeal, we first set forth the chronology of the appeal. Susan filed a notice of appeal on September 11, 2012. Joseph filed a notice of appeal on September 28. In response to Joseph's notice of appeal, the clerk of the Nebraska Supreme Court sent a letter to the Madison County Court and copied all attorneys of record, advising them that pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2010), multiple appeals from the same case could not be docketed. The clerk advised, "Therefore, the notice of appeal filed by [Joseph] shall be treated as a second notice of appeal in the above-captioned matter." This is in accord with § 2-101(C), which states:

> Method of Docketing Case; Multiple Appeals from Same Case Prohibited. Upon receipt of the material required by § 2-101(B), the Clerk of the Supreme Court shall thereupon docket the case designating the party or parties first having filed the notice of appeal in the district court as appellant or appellants. All other parties shall be designated as appellees, and any attempt to appeal thereafter made by any party to the action shall be filed in the existing case and not separately docketed.

Susan filed a "Brief of Appellant" on February 1, 2013. The State filed a "Brief of the Appellee" on February 28. On that same date, Joseph filed a motion for a 30-day extension of his brief date, which was granted. The guardian ad litem filed a "Brief of Guardian Ad Litem" on March 4. Susan filed her reply brief on March 13. Thereafter, Joseph filed a brief entitled "Brief of Appellee, Joseph . . ." on March 15. No further briefing occurred.

[9] In Joseph's brief, he assigned errors and sought affirmative relief, but there is no designation of a cross-appeal on the cover of the brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012), which section states in full:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed "Brief on Cross-Appeal" and shall be

prepared in the same manner and under the same rules as the brief of appellant.

In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Nebraska Supreme Court declined to consider a father's arguments appealing the termination of his parental rights, because he failed to properly designate his arguments as a cross-appeal. As in the present case, the father filed a notice of appeal after the mother did so, making him an appellee. The father set forth assignments of error in his brief, which he entitled simply "'Brief of Appellee.'" *In re Interest of Natasha H. & Sierra H.*, 258 Neb. at 144, 602 N.W.2d at 450. In its refusal to consider the father's assignments of error, the court explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," *id.* at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated, pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained," 258 Neb. at 145, 602 N.W.2d at 450. The court further cautioned parties seeking appellate review of their claims to be aware of the rules governing appeals, noting that "[a]ny party who fails to properly identify and present its claim does so at its peril." *Id.* at 147, 602 N.W.2d at 451.

[10] We note that in the present case, after Joseph filed his notice of appeal, the appellate clerk notified him that his notice of appeal would be treated as a second notice of appeal and referred him to § 2-101(C). This rule advised Joseph that he would be designated as an appellee, and he correctly designated himself as an appellee on his brief. Therefore, this case is governed by *In re Interest of Natasha H. & Sierra H.*, and is distinguishable from *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (2004), and *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). In both *Knaub* and *In re Application A-16642*, the parties filing second notices of appeal mistakenly designated their briefs as briefs of appellants. Here, Joseph correctly identified his brief as that of an appellee, but he failed to comply with the proper filing of a cross-appeal. Section 2-101(E) instructs an appellee on how to assert a cross-appeal, stating: "Cross-Appeal. The proper

filing of an appeal shall vest in an appellee the right to a cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by § 2-109(D)(4)."

Based upon our court rules, Joseph, as an appellee, was required to identify his cross-appeal on the cover of his brief and in a separate section in compliance with § 2-109(D)(4). As in *In re Interest of Natasha H. & Sierra H., supra*, we decline to waive the rules on his behalf and to award him affirmative relief. Because Susan and Joseph both assigned as error the court's decision adjudicating Chloe, however, we consider Joseph's argument on this issue in addressing Susan's assigned error.

## VII. CONCLUSION

We conclude that the State sufficiently proved that Chloe was within the meaning of § 43-247(3)(a) because there was a definite risk that her parents would not provide for her needs, resulting in harm. Because Joseph did not properly designate his brief as a cross-appeal, we do not address his assigned errors. Accordingly, we affirm the county court's order.

AFFIRMED.